UNITED STATES of America, Appellee,

v.

Thomas Arthur DARNELL, Appellant.

No. 76–1239.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 17, 1976.

Decided Nov. 5, 1976.
Certiorari Denied Feb. 22, 1977.
See 97 S.Ct. 1134.

Mark W. Peterson, St. Paul, Minn., for appellant.

Joseph T. Walbran, Asst. U.S. Atty., Minneapolis, Minn., for appellee; Robert G. Renner, U.S. Atty., Minneapolis, Minn., on brief.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

* TALBOT SMITH, Senior District Judge, Eastern

TALBOT SMITH, Senior District Judge.

In this case, the defendant was convicted of various offenses against the narcotics laws,[1] as well as conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846. Under the concurrent sentence rule the judgment of convictions is affirmed since conviction is clearly proper on the conspiracy count.

Viewing, the testimony in the light most favorable to the Government, the evidence discloses the organization and existence of an organized operation to sell, deliver, and distribute narcotics. At the top of this particular chain of distribution was Jeff Edmundson. He supplied drugs to appellant (hereafter "defendant") Darnell. Darnell, in turn, supplied Chris Dahl. Dahl testified for the Government as to the entire operation. Dahl sold to Dale Malikowski, commonly referred to in the trial transcript as "Chopper." Dahl also supplied his brother, Roy Dahl and a friend, Emory Brewington.

Two quantities of approximately 10,000 tablets of amphetamines followed this route. Special Agent Tomcik of the Federal Drug Enforcement Administration (hereafter "DEA") testified that on April 10, 1975, he proceeded to the home of James Kampa, where he met Malikowski. Together they drove to an area in north Minneapolis where Malikowski made a purchase from Dahl, who, in turn, had obtained the drugs from defendant Darnell, his exclusive source. The next transaction, chronologically, was on May 6. At this time Agent Tomcik purchased another 10,000 tablets from Malikowski, who, again, had obtained the tablets from Dahl. The money paid was later picked up from Malikowski by Edmundson, described by Dahl as Darnell's "partner." The tablets involved in this May 6th transaction had, as before, been obtained by Dahl from defendant Darnell.

Dahl lived with one Polly Wheeler. It was her testimony that roughly from January to May of 1975, Darnell on numerous occasions was involved with Dahl on drug matters at their residence. She also testified that on both the April 10 and May 6 transactions, Chopper had picked up the drugs at this location.

The next transaction, that of May 20th, involved 100,000 tablets. The modus operandi was similar. Agent Tomcik negotiated with Malikowski for the delivery of the tablets, but the delivery was never made. Malikowski was arrested while trying to deliver the order to Tomcik. Darnell had talked to Dahl, stating that the tablets were available. Darnell picked up Dahl in his (Darnell's) car, which, we note, carried a loaded pistol in the glove compartment, and then the two of them drove to a meeting with Edmundson who transferred the tablets to Dahl and Darnell. Dahl and defendant Darnell proceeded to Malikowski's house together, Dahl handing over to Malikowski a brown sack containing the tablets.

---

District of Michigan, Southern Division, sitting by designation.

1. Count IV of the indictment charged attempting to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846; Count V, attempting to possess with intent to distribute methamphetamine in violation of the same statutes; Count VI, carrying a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(2).

21 U.S.C. § 841(a) provides:
   Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance * * *.

21 U.S.C. § 846 provides:
   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

18 U.S.C. § 924(c) provides, in relevant part:
Whoever—

   *   *   *   *   *   *

   (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

Darnell and Dahl then followed him towards the motel where the sale to Agent Tomcik was to take place but, as we have noted, was prevented from consummation by the arrests. Some weeks later it was learned that these pills were "turkey," street slang for bogus or fake pills. Actually they were caffeine. Because of this circumstance, such knowledge being obtained after the event,[2] defendant assured Dahl that "the federal charge, you know, wouldn't be any good because the pills weren't good."

It is on this point that both the Government and the defendant have expended most of their verbal and written efforts. The problem may be very simply posed: Defendant sold a substance which he believed to be amphetamines but actually was merely caffeine. Are acts and intent with respect thereto punishable as a criminal attempt under 21 U.S.C. § 846?[3]

We are here confronted with the law of attempt. The question has fascinated scholars for many years[4] and has provoked a vast amount of discussion, more or less learned.[5] Disagreement exists as to what the law is, what it ought to be, and why. Thus a familiar classroom problem: The defendant shot at a stump, believing it to be his enemy. Did he intend to shoot the stump, which is no offense, or his enemy, which is criminal? Judge (then Dean) Thurman Arnold summarizes the views of distinguished scholars on this question as follows: "Wharton says there is guilty intent here but no overt act. Mr. Beale says there is no guilty intent. Mr. Sayre says there is an overt act and guilty intent but it is not punishable if defendant did not act reasonably."[6] Modern courts have frequently sought solution in differentiating factual impossibility, that is, although defendant's objective was proscribed by law, it failed because of a factual circumstance unknown to defendant, from legal impossibility, where the acts which the defendant set in motion, even if carried out as he desired (here the transfer of the bogus amphetamines) would not be a crime. "Traditional analysis," we are told, "recognizes legal impossibility as a valid defense, but refuses to so recognize factual impossibility."[7] But the validity of such analysis has been challenged, with the assertion that the two impossibilities, legal and factual, are logically indistinguishable.[8] But beyond the logical problem is the pragmatic: the difficulty of categorization. The tidy dichotomy of the theoretician becomes obscure in the courtroom, as we seek to define for a jury, and then require them to differentiate and apply such concepts as motive, intent, wish, will, expectation and desire. Thus at least one court[9] would not concern itself with any asserted distinction between legal and factual impossibility, as long as defendant's objective was criminal, whereas in the case before us the defendant avoids

2. This knowledge is established by the jury's verdict under the court's instructions. It is conceded by defendant that the record on appeal is that he possessed and distributed tablets which he believed to be illicit methamphetamine tablets.

3. 21 U.S.C. § 846 is quoted in note 1, *supra*.

4. *E. g.*, Coke, *Third Institute* 69 (1644).

5. Among the many articles published (*see* compilation in *United States v. Berrigan*, 482 F.2d 171, 187 n. 29 (3d Cir. 1973)), the following may be found particularly helpful: Arnold, Criminal Attempts—The Rise and Fall of an Abstraction, 40 Yale L.J. 53 (1930); Elkind, Impossibility in Criminal Attempts: A Theorist's Headache, 54 Va.L.Rev. 20 (1968); Enker, Impossibility in Criminal Attempts—Legality and the Legal Process, 53 Minn.L.Rev. 665 (1969), Hall, Criminal Attempt—A Study of Foundations of Criminal Liability, 49 Yale L.J. 789 (1940); Sayre, Criminal Attempts, 41 Harv. L.Rev. 821 (1928).

6. Arnold, *supra* note 5, at 69 n. 46 (citations omitted).

7. *United States v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976) (citing *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973)).

8. *E. g.*, Hall, *supra* note 5, at 836.

9. *United States v. Heng Awkak Roman*, 356 F.Supp. 434, 438 (S.D.N.Y.), *aff'd*, 484 F.2d 1271 (2d Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974).

such snares by asserting both legal and factual impossibility.[10]

Other analyses [11] are no more definitive. The whole topic presents "a rather esoteric question" [12] and no consensus can be ascertained from the limited number of federal cases discussing the problem.[13]

In view of the obvious conclusion that the conspiracy count cannot be even remotely challenged on the April 10th and May 6th transactions, we queried counsel on oral argument as to why so much time and effort were devoted to the May 20th transaction, involving the bogus pills. In reply we were told that the case presented an opportunity to find out just "what the attempt statute means." We decline to grasp the nettle. There is no need upon these facts and we have other things to do. We doubt, as well, that our resolution of the law of attempt would be any more definitive than what has gone before, year after year. The problem cries for legislative solution. Until it comes the issue lurks in a semantic swamp.[14]

In this circuit we have no invariable, fixed practice as to the invocation of the concurrent sentence rule, namely, "that where a defendant receives concurrent sentences on plural counts of an indictment, and where the conviction on one count is found to be good, a reviewing court need not pass upon the validity of the defendant's conviction on another count or on other counts if a ruling in his favor would not reduce the time that he is required to serve under the sentence imposed with respect to

the valid conviction." *Sanders v. United States,* 541 F.2d 190, 193 (8th Cir. 1976).

We have applied the rule at times and, upon occasion have refused to apply it.[15] In this, our practice has somewhat paralleled that of the Supreme Court, where *Benton's* [16] refusal to apply was followed shortly thereafter by *Barnes,*[17] the Court therein noting that "[a]lthough affirmance of petitioner's conviction on two of the six counts carrying identical concurrent sentences does not moot the issues he raises as to the remaining counts, *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), we decline as a discretionary matter to reach these issues. Cf. *United States v. Romano,* 382 U.S. 136, 138, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965)." [18]

The key to application or nonapplication of the rule lies as thus stated, in the discretion of the court. *Sanders, supra.* In the exercise of such discretion we consider the possibility of substantial prejudice that might flow from the presence on defendant's record of a conviction appealed but not ruled upon, whether the matter comes to us on direct appeal or collateral attack, and whether the evidence on the unreviewed counts might have "spilled over" and influenced decision on the count ruled upon. The short of it is that, following the teaching of *Benton, supra,* where we apply the rule, we apply it with caution.

Here the evidence as to conspiracy, the agreement and overt acts in furtherance thereof, is well established and complete, as

---

**10.** "[I]t was legally and factually impossible for appellant to commit the offenses charged in Counts IV, V and VI." Brief for Appellant at 11.

**11.** *See* articles and cases cited in notes 5, 7 and 9, *supra.*

**12.** *United States v. Heng Awkak Roman, supra,* 484 F.2d at 1272.

**13.** *See United States v. Oviedo, supra; United States v. Berrigan, supra; Ventimiglia v. United States,* 242 F.2d 620, 625–26 (4th Cir. 1957); *United States v. Heng Awkak Roman, supra; United States v. Hair,* 356 F.Supp. 339 (D.D.C. 1973).

**14.** *See* discussion in *Berrigan, supra,* 482 F.2d at 186, of proposed provisions of the Model Penal Code, proposals of the National Commission on Reform of Criminal Laws, and measures before Congress incorporating what are hoped to be clarifying statutory provisions.

**15.** *See Sanders, supra,* 541 F.2d at 193.

**16.** *Benton v. Maryland,* 395 U.S. 784, 791–93, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

**17.** *Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).

**18.** *Id.* at 848 n. 16, 93 S.Ct. at 2364.

to source, distribution, and sale of genuine drugs, without any contamination from the evidence respecting the May 20th transaction. The May 20th transaction was merely the last of a series. It is true, of course, that we may engage in countless hypotheses as to the possible effects of the other counts here not passed upon, as to recidivism and future impeachment,[19] and we are aware, as well, that this question comes before us on direct appeal and not on collateral attack.[20] It must be observed, however, that literal application of such speculative consequences, resting upon a supposition of defendant's continued criminality, would effectively bar the application of the rule "as a convenient tool to be employed by a reviewing court." [21]

We would note, finally, that the concurrent sentence doctrine comes to us against a background of ever-increasing dockets with the demands upon our time of literally thousands of litigants equally deserving. While it is our hope and endeavor that, despite such loads, we never, so far as within our power, permit injustice to go unreversed, yet at the same time we will turn away, without opinion, from the consideration of issues in criminal cases which, on balance, will not substantially alleviate the punishment imposed if decided in defendant's favor. The luxury of time is denied us. We are, even now, overdrawn on this resource.

Affirmed.

---

**19.** *See Sibron v. New York*, 392 U.S. 40, 50–58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

**20.** *See United States v. Neff*, 525 F.2d 361, 364–65 (8th Cir. 1975) (Lay, J., concurring).

**21.** *Sanders, supra*, 541 F.2d at 193.