UNITED STATES of America, Appellee,

v.

S. Richard BEITLING, Appellant.

No. 76–1235.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1976.

Decided Nov. 9, 1976.

Rehearing and Rehearing En Banc
Denied Dec. 10, 1976.

Certiorari Denied March 7, 1977.
See 97 S.Ct. 1334.

Robert G. Duncan, Duncan & Russell, Kansas City, Mo., argued and on brief for appellant.

Michael W. Farrell, Atty., Dept. of Justice, c/o T. George Gilinsky, Washington, D. C. (argued); Bert C. Hurn, U. S. Atty., Kansas City, Mo., Sidney M. Glazer, Atty., Dept. of Justice, Washington, D. C., on brief for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and WEBSTER, Circuit Judges.

BRIGHT, Circuit Judge.

■ S. Richard Beitling, a practicing attorney in Kansas City, Missouri, appeals his conviction after a jury trial on two counts of making false, material declarations before a federal grand jury, in violation of 18 U.S.C. § 1623. Beitling seeks reversal on the grounds that 1) his statements were not material, because the grand jury already knew the truth of the matters about which he was questioned; and 2) the prosecution produced insufficient evidence to sustain the conviction because Beitling's grand jury testimony was merely nonresponsive and not "literally false." We affirm the conviction on count I. Since the district court sentenced appellant to concurrent sentences of two years' imprisonment on each count, suspending all imprisonment except for 90 days, we do not reach the sufficiency of the evidence issue relating to count II, but choose to apply the concurrent sentence doctrine.

We relate the factual background. This prosecution arose out of Beitling's representation of Ronald Mustari and William Stimack, who were arrested in Kansas City on July 10, 1972, for unlawful flight to avoid prosecution of a theft charge pending in Harris County (Houston), Texas. Mustari and Stimack first retained appellant Beitling to represent them in extradition proceedings. Beitling arranged bail for his clients through a bondsman-friend named Donald Emerson. The testimony indicates that while free on bail, Mustari was approached by Emerson and told that, for $5,000, a "fix" of the Texas charges could be arranged. Shortly thereafter, on the 20th and 21st of September 1972, Beitling told Mustari and Stimack that Emerson had

worked out a fix of the Texas charges. The price, however, was now $12,500—$2,500 for Emerson and $10,000 to be paid to bribe the Texas officials. Beitling told Mustari that it would be less expensive and less troublesome for Mustari to put in the "fix" on the Texas charges than it would be to surrender to the Texas authorities, make bond, and go to trial.

Mustari went to the FBI on September 22, 1972, related this story, and agreed to cooperate in an investigation. The FBI outfitted Mustari with a concealed recording device so that conversations about the alleged bribery scheme between Mustari, Stimack, Beitling, and Emerson could be preserved. Mustari recorded six conversations between September 25, 1972, and October 31, 1972. The FBI also gave Mustari a cassette recorder to record telephone conversations with Beitling. Mustari recorded four telephone conversations during the same time period.

The tape recordings reveal that Beitling discussed the proposed bribery scheme with Mustari and Stimack on a number of occasions. Beitling told Mustari and Stimack that Emerson's contacts in Houston would direct Beitling to appropriate people in the Texas prosecutor's office, and that Beitling would thereafter handle the arrangements. Beitling told Mustari and Stimack that he, Beitling, would have to be extremely careful in approaching the prosecutors in order to avoid getting himself indicted for bribery, because he did not know who it was in the prosecutor's office that was to be bribed. At Beitling's request, Mustari deposited a check for $12,500 in a newly-created savings account.[1] Funds could be drawn from the savings account only with the signatures of both Emerson and Beitling. According to the recorded conversations,

the establishment of the savings account would enable Beitling to give assurance to the Texas officials that payoff money was indeed available.

Beitling flew to Houston on October 2, 1972, at Stimack's expense and remained there until October 4th. The FBI kept Beitling under surveillance in Houston. Beitling met with a bondsman named Vannerson, several attorneys, and visited a police station and the clerk of court's office several times. While in Houston, the FBI observed no illegal activity on Beitling's part.

After returning to Kansas City, Beitling continued to discuss a possible fix with Mustari and Stimack. On October 26, 1972, Mustari asked Beitling why no fix had come through yet. Beitling replied that the "heat" was on from a state level investigatory agency in Texas where Emerson did not have contacts, but once things cooled down, so far as Beitling knew, the fix could still be arranged.

On October 31, 1972, a federal grand jury was convened to investigate the bribery scheme. Mustari, Stimack, Emerson, and Beitling appeared as witnesses under subpoena. On the morning preceding testimony before the grand jury, Beitling told Mustari and Stimack to assert their self-incrimination privileges. By that time, Beitling had become convinced that he had been called in to testify about the bribery scheme.

In his sworn grand jury testimony, Beitling denied ever having told clients, including Mustari and Stimack, that the best way to take care of criminal charges was through a fix, rather than fighting the charges legally. This testimony formed the basis of count I of the perjury indictment.[2]

---

1. The check was dishonored by the drawee bank for insufficient funds.

2. Count I set out the following allegedly perjured testimony:

    Q. Have you ever represented to anyone yourself personally that the way to take care of a case is to fix it as opposed to fight it legally?

    A. Oh, I have represented a lot of people where they always want a fix.

    Q. No, I'm asking you, have you ever represented—

    A. To fix it?

    Q.—to a client that the way to handle a case is to make a payoff or a fix as opposed to fight it legally?

    A. No. The only thing that I have ever done with any client at all would be the

Beitling further testified that he had no knowledge of any effort on the part of Mustari and Stimack or anyone else to secure an illegal extrajudicial disposition of the Texas theft charges through bribery. His testimony in that regard formed the basis for count II.[3]

With this factual background, we discuss Beitling's contentions.

## I. *Materiality.*

Beitling contends that his responses to the prosecutor's questions were immaterial to the grand jury's inquiry, because the prosecutors and the grand jury already knew the truth of the matters about which they questioned Beitling, namely, the nature of his activities in Houston, and the

> typical check charge where you ask the prosecutor, you know, do they have any objection if somebody has written an insufficient fund check for 50 bucks or $20 or something and it's their first offense, is it all right if I would go talk to the people and if they would accept that, if my clients would then do this, you know, pay it off and pay the court costs, would they put them on the prosecutor's provisional parole thing or would they accept some sort of a less plea and put them on parole. This is the only thing I have ever done and I have always approached it through the prosecutor's office to see if it was all right with them.
>
> Q. All right. For instance, I'm talking about representations which may have been made by you which would have led people such as Mustari or Stimack to seek your services or a man, you know, otherwise that might know you to lead clients to you. What I want to know is if you ever have represented, you know, that because of the peculiar facts of a case, it's not worth fighting it legally but we can take care of it with a fix?
>
> A. You mean buy some prosecutor or some law enforcement agency off?
>
> Q. Right.
>
> A. No, I have never.
>
> Q. Or judicial officer?
>
> A. No, any judicial officer, any law enforcement agencies, I have never given any money to anybody under any circumstances or have I ever represented that way. There are those in this town that do. I never have.
>
> Q. You have never done it and you have never represented that you would consider doing it?
>
> A. No, I felt I didn't need to.

3. Count II alleged that the following testimony was perjurious:

contents of his conversations with Mustari and Stimack. We disagree.

A conviction under 18 U.S.C. § 1623 must be based upon grand jury testimony which is material to a proper inquiry of the grand jury. *See United States v. Phillips*, 540 F.2d 319, at 327–328 (8th Cir. 1976), *pet. for cert. filed*, 45 U.S. L.W. 3256 (U.S. Sept. 23, 1976) (No. 76–434); *United States v. Lasater*, 535 F.2d 1041, 1047–48 (8th Cir. 1976); *United States v. Koonce*, 485 F.2d 374 (8th Cir. 1973). These cases also hold that the issue of materiality is a question of law to be decided by the court in light of the circumstances surrounding the grand jury's investigation. The standard of materiality developed in those cases is that the deliberate, false dec-

> Q. Do you know of any attempts by Mustari or Stimack to achieve anything which would be outside of the law in terms of disposing of this case, to accomplish it through any sort of a bribe or a special favor or a political contribution or anything like that?
>
> A. No not that I know of. I have not been informed of anything by either of them.
>
> * * * * * *
>
> Q. Now, then, to your knowledge has Mr. Stimack or Mustari ever made any efforts, any overt acts, any active steps to fix this case in Texas by payment of monies to achieve a settlement by extrajudicial means?
>
> A. Not to my knowledge that I have in any way have any knowledge of at all.
>
> Q. Okay. To your understanding, was this $12,500 which you have mentioned intended to be used for the purpose of fixing this case in Texas?
>
> A. No.
>
> * * * * * *
>
> Q. But to your knowledge, Mr. Beitling, there was never any efforts made by any person to achieve a fix of this case by the payment of any sums for any other than legitimate legal fees?
>
> A. Legal fees, bond fees, expenses and whatever.
>
> Q. Never any proposal contemplated or acted upon by any persons to pay any sums of money to persons in the Houston District Attorney's office or judiciary or anyone of that sort to achieve settlement of the case?
>
> A. What my clients may or may not have contemplated but not me.
>
> Q. Not to your knowledge?
>
> A. Not to my knowledge.

laration of the accused must tend to influence, mislead, or hamper the grand jury's investigation of a matter which is within the grand jury's authority to investigate. As we said in *United States v. Koonce,*

> [i]t is established that a perjury conviction may not be based upon testimony not material to any proper inquiry of a grand jury. . . . And the question of materiality is one of law for the courts to decide. . . . The proper determination of the question, however, is essentially a factual matter for the trial judge to determine, . . . bearing in mind the broad investigatory powers of a grand jury to uncover offenses against federal law. [*United States v. Koonce, supra,* 485 F.2d at 380 (citations omitted).]

The district court held a hearing on the issue of materiality, and determined that the grand jury's investigation extended beyond Beitling's activities to an inquiry concerning the possible involvement of public officials in Texas and other individuals in the bribery scheme. Therefore, despite the fact that the grand jury and the prosecutors already had substantial information that Beitling had discussed "fixing" the Texas charges pending against Mustari and Stimack, the district court determined that Beitling's blanket denial of involvement frustrated possible inquiry into the involvement of others in the bribery scheme. The district court stated:

> In calling these four witnesses [Mustari, Stimack, Emerson, and Beitling], the government hoped that through their cooperation and testimony, the names of other persons believed to have been involved in the fix, including persons in the courts and prosecutor's office in Harris County, Texas, could be obtained. Had defendant responded affirmatively to the questions relating to his knowledge of the fix, he would have been asked to identify the officials who were the objects of the bribes, his contacts in Houston, and the means and methods used in carrying out the alleged fix. Any persons so identified would then have been subpoenaed or indicted; or, if they were directly involved, the government would have sought corroborating evidence and indicted them. When defendant responded that he had no knowledge of any fix attempt, the government's attempt to obtain additional information about the involvement of other persons in the scheme was frustrated.

The grand jury knew that Beitling had spoken to his clients, Mustari and Stimack, about a fix. Although there was no corroborative proof of an actual fix, the grand jury was entitled to credit Beitling's tape-recorded statements to Mustari and Stimack that Beitling contemplated bribing Texas officials in order to dispose of the pending Texas criminal charges. The grand jury was entitled to pursue this lead. If Beitling's representations to his clients concerning a fix constituted merely a lie to obtain a fee from his client, *see* suggestion in appellant's brief at 17, the grand jury likewise was entitled to know that fact, because it would have been relevant to the legitimate inquiry of the grand jury. Instead, Beitling stonewalled the investigation by disclaiming any knowledge of a possible bribery scheme and by denying having made recommendations to any client that a case be fixed.

Under these circumstances, the district court properly ruled that Beitling's falsehoods were material to the grand jury inquiry because they impeded investigation of possible involvement of other individuals, including Texas officials. Conversely, if no bribery scheme actually existed, the grand jury was nevertheless impeded and frustrated in its determination of the facts of a matter within its proper scope of inquiry. As we said in *Phillips, supra,*

> [a] grand jury investigation is not carried out until every available clue has been run down and all witnesses have been properly examined to discover whether a crime has been committed. [at 328.]

## II. *Sufficiency of the Evidence.*

Beitling next contends that the Government's questions with regard to the bribery

attempt were ambiguous and that his answers to those questions were merely non-responsive, and not literally false. We shall address this contention separately with respect to each of the two counts.

Essentially, count I of the indictment charged Beitling with falsely answering the prosecution's questions as to whether Beitling had ever told any of his clients that the best way to handle a case was to fix it through an illegal bribe rather than contest the charges through regular channels. Beitling contends that all he ever said in response to these questions was that he had never bribed anyone, and that he did not deny having recommended bribery. Beitling contends that his response was literally true, because there was no evidence that he ever actually bribed anyone. The record requires that we reject this contention. It is true that most of Beitling's statements set out in count I of the indictment merely asserted that he had not bribed anyone. *See* note 2 *supra*. However, we believe that the prosecutors did succeed, finally, in getting Beitling to answer their question:

Q  (By Mr. Cornwell)  Have you ever represented to anyone yourself personally that the way to take care of a case is to fix it as opposed to fight it legally?

A  Oh, I have represented a lot of people where they always want a fix.

Q  No, I'm asking you, have you ever represented—

A  To fix it?

Q  —to a client that the way to handle a case is to make a payoff or a fix as opposed to fight it legally?

A  No. The only thing that I have ever done with any client at all would be the typical check charge where you ask the prosecutor, you know, do they have any objection if somebody has written an insufficient fund check for 50 bucks or $20 or something and it's their first offense, is it all right if I would go talk to the people and if they would accept that, if my clients would then do this, you know, pay it off and pay the court costs, would

they put them on the prosecutor's provisional parole thing or would they accept some sort of a less plea and put them on parole.

■  Although we are troubled by the prosecutor's failure to ask Beitling about the precise conversations involved, we feel that this interchange presented the question and elicited the false response in a sufficiently clear manner. Although Beitling continued with a long explanation to the effect that he never bribed anyone, but only engaged in innocent plea bargaining, we find Beitling's initial response sufficiently unequivocal and contrary to fact to sustain his perjury conviction on count I. Beitling, an attorney, could not have failed to understand the significance of his answer that he had never represented that he would consider "fixing" a case.

As to count II, we have considerably more doubt. This count charges Beitling with falsely responding to the prosecution's questions as to whether he had any knowledge about any attempt by Mustari or Stimack to make an illegal fix of this case. Beitling contends that Mustari and Stimack personally never did anything to fix this case, so that Beitling's response to this question was not literally false. We agree that the prosecution's questions set out in count II of the indictment, which used such words as "efforts," "attempts," and "overt acts," may well have been ambiguous and may have been understood to refer to direct contacts between Mustari and Stimack and Texas officials, rather than conduct between these clients and Beitling. The prosecutor perhaps should have framed these questions more precisely than he did if he desired to obtain a perjury conviction, for "[p]recise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States*, 409 U.S. 352, 362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568 (1973). However, having already affirmed Beitling's conviction on count I, we choose to apply the concurrent sentence doctrine for the reasons stated in *United States v. Darnell*, 545 F.2d 595 (8th Cir. 1976).

Affirmed.