**UNITED STATES of America, Appellee,**

v.

**Walter WILLIAMS, Appellant.**

**No. 76–1277.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1976.

Decided Jan. 19, 1977.

Jack S. Nordby, St. Paul, Minn., for appellant; John R. Wylde, Jr. of Thomson, Wylde, Nordby, Blethen & Peterson, St. Paul, Minn., on brief.

Robert G. Renner, U. S. Atty., Minneapolis, Minn., for appellee.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

Appellant Walter Williams was convicted in a jury trial in the United States District Court for the District of Minnesota, on three counts charging violations of the narcotics laws. Count II charged Williams with importing cocaine into the United States in violation of 21 U.S.C. § 952(a) [1] and 18 U.S.C. § 2.[2] Count III charged that Williams and co-defendant Lisa Anne Schlingerman [3] conspired with Richard Paul Thompson and Eugene Van Drasek [4] to import cocaine into the United States in violation of 21 U.S.C. § 952(a) and 21 U.S.C. § 846.[5] Count IV charged Williams and Schlingerman with conspiracy to distribute

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 21 U.S.C. § 952(a) provides, in relevant part:

   (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter * * *.

2. 18 U.S.C. § 2 provides:

   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. Schlingerman, who was tried jointly with Williams, was found guilty on Counts III and IV of the indictment and of possession of cocaine with intent to distribute (Count I). Schlingerman did not appeal her convictions.

4. Thompson and Van Drasek were named as co-conspirators, but not defendants, in the indictment.

5. 21 U.S.C. § 846 provides:

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

cocaine in violation of 21 U.S.C. §§ 841(a)(1)[6] and 21 U.S.C. § 846.[7]

On each of Counts II, III, and IV, Williams received a sentence of six years to be followed by a special parole term of five years. The sentences on each count are to be served concurrently, but consecutively to a state sentence. We affirm.

On this appeal, Williams contends that the District Court erred in admitting into evidence certain conversations between Thompson and Schlingerman, the District Court erred in replaying a tape recording of a conversation between Thompson and Schlingerman upon request of the jury, and that he should have been sentenced on only one of the two conspiracy counts because, according to the government's theory, there was but one conspiracy.

Viewed in the light most favorable to the government, the evidence disclosed that in December, 1974 or January, 1975, Thompson and Williams entered into an agreement to import cocaine into Minneapolis from Colombia. Thompson and Williams were each to put up half of the money for purchasing the cocaine and each was to go to Colombia. Williams was to buy the cocaine and give it to Thompson, who was to take it to Minneapolis where he would turn it over to Williams for distribution.

In execution of their agreement, Thompson and Williams made three trips to Colombia. The first was in March, 1975. Thompson testified that he brought one and one-half pounds of cocaine back to Minneapolis. He then gave the cocaine to Williams in Minneapolis, for distribution. Two or three weeks later, Williams turned over to Thompson his share of the proceeds from the sale of the cocaine.

Thompson made a second trip to Colombia in June, 1975. The scenario was essentially the same as for the May trip. Thompson testified that in mid-June, Lisa Schlingerman, with whom Williams lived, gave him $5,000 to take down to Williams in Colombia "[b]ecause Walter [Williams] didn't want to carry that much on him."

Thompson made a third trip to Colombia in August, 1975. This time, however, the plan did not succeed. Thompson took one Eugene Van Drasek with him. Thompson received four pounds of cocaine from Williams to bring back to Minneapolis. The cocaine was placed in Van Drasek's suitcase. On August 21, 1975, Van Drasek was arrested as he went through customs at the Miami airport. The four pounds of cocaine were found in Van Drasek's suitcase and Thompson was arrested shortly thereafter. At this point, the conspiracy's chance of success was terminated, but the unlawful agreement still existed, both as to delivery and to payment therefor.

Thompson decided to cooperate with the Drug Enforcement Administration (DEA) agents. A call was placed to Lisa Schlingerman in Minneapolis. Thompson, in the presence of the DEA agents, told Schlingerman, "I have got the stuff here and it's good and I will be coming into Minneapolis tomorrow." He also asked that she have the money ready for the packages.

The agents then extracted one ounce of the cocaine found in Van Drasek's suitcase, placing it, together with fifteen ounces of flour, in a "dummy package."[8]

On August 22, Thompson, accompanied by two DEA agents, flew to Minneapolis, arriving at approximately 8:00 P.M. Adjoining rooms at the Marriott Inn were

---

**6.** 21 U.S.C. § 841(a) provides:

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; * * *.

**7.** Thompson and Van Drasek were also alleged to have participated in the conspiracy charged in Count IV.

**8.** The one ounce of cocaine was sealed in a piece of plastic and, hence, separated from the flour. Five other dummy packages were made, containing only flour, in order to simulate the four pounds of cocaine seized from Van Drasek.

obtained for Thompson and the agents. Thompson then called Schlingerman and arrangements were made for Schlingerman to come to Thompson's room at the Marriott, where Thompson would give Schlingerman the dummy package containing an ounce of cocaine, and Schlingerman would give Thompson $10,000. Thompson was to take the $10,000 to Williams, who had remained in Colombia.

Since Schlingerman was late in arriving, Thompson placed a second telephone call to her.[9] Schlingerman soon arrived at Thompson's hotel room. Thompson gave her a briefcase containing the dummy package of one ounce of cocaine and fifteen of flour. In exchange, Schlingerman gave Thompson $10,000. Tape recordings were made of both telephone calls to Schlingerman and also of the conversation between Schlingerman and Thompson in Thompson's hotel room.[10]

Appellant alleges as his first ground for reversal that the admission of the tape recordings of the two telephone conversations between Thompson and Schlingerman, and the motel room conversation, between the two parties was prejudicial error. He contends that the conversations were not in furtherance of the conspiracy, and were hearsay, not within the exception to the hearsay rule for statements made by a coconspirator.[11] It is argued that the conspiracy had terminated through its failure, upon the arrest of Van Drasek and Thompson, and the seizure of the cocaine by the federal agents. But it does not follow as of course that the arrest of some of the coconspirators ends the conspiracy. As we held in *United States v. Burnett*, No. 75–1460 (8th Cir. February 18, 1976), *cert.*

*denied*, —— U.S. ——, 97 S.Ct. 122, 50 L.Ed.2d 114 (1976): ·

\* \* \* Cranage was in the custody or control of the Government when he put in the telephone call to Burnett. Moreover, both Kirk and Ms. Barnett had been arrested. Hence the conspiracy had ended, says Burnett. However, we have concluded that the conspiracy had not ended. Indeed, the record shows that Burnett had continued to distribute heroin; he knew of Kirk and Barnett and their role in the conspiracy, and they still remained at large and might well be continuing their wholesaling of drugs. *The test is not the arrest of some of the conspirators, but whether the remainder of the conspirators were able to continue with the conspiracy.* United States v. Russano, 257 F.2d 712, 715 (2d Cir. 1958); United States v. DeSapio, 435 F.2d 272 (2d Cir. 1970), cert. denied, 402 U.S. 999, [91 S.Ct. 2170, 29 L.Ed.2d 166] (1971).

Slip op. at 4 (emphasis added).

■ We find that the conspiracy did not end with the arrests of Thompson and Van Drasek, and the seizure of their cocaine at the Miami Airport. The evidence, viewed in the light most favorable to the government, *United States v. Hill*, 464 F.2d 1287, 1288 (8th Cir. 1972), shows an overall on-going agreement to import cocaine into Minneapolis from Colombia and to distribute it. The three trips by Williams and Thompson were in furtherance of this agreement. After the arrest of Thompson and Van Drasek, the remainder of the conspirators proceeded with their unlawful agreement, Schlingerman, in the Marriott Inn on August 22nd, as heretofore described, and Williams, in Colombia.

9. Schlingerman had been out to the Marriott once and had gone to the wrong room, 5034 instead of 5035. Schlingerman then went home where she received Thompson's second call.

10. The agents had fitted Thompson with a body transmitter. The receiver for the body transmitter and the recording equipment were in the adjoining room where the agents were staying.

11. The exception to the hearsay rule for statements made by coconspirators has been codified in Fed.R.Evid. 801(d):

(d) *Statements which are not hearsay.* A statement is not hearsay if—

\* \* \* \* \* \*

(2) *Admission by party-opponent.* The statement is offered against a party and is \* \* \* (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

The test is not the arrest of some of the conspirators, but whether the remainder of the conspirators were able to continue with the conspiracy.

*United States v. Burnett, supra,* slip op. at 4.

■ With respect to the use of hearsay against Williams, contained in portions of the Thompson-Schlingerman conversations, there is merit to the allegation of error. Although the conspiracy itself, as between the remaining members, was still viable, Thompson's status as a coconspirator had been ended by his arrest and his repudiation of the objects of the conspiracy.[12] Hence those portions of the conversation concerning Thompson's statements as to what Williams had told him as to his plans, and his directions to him, were all inadmissible hearsay.[13] The receipt of such hearsay[14] was not, however, prejudicial error. Thompson testified in detail as to Williams' involvement and his testimony was corroborated by the passports of Thompson and Williams which showed both men in Colombia at the times testified to by Thompson. Williams' involvement in the conspiracy had been established by abundant evidence and the conversational excerpts here quoted, in our opinion, were of minimal probative value, adding nothing substantial to the case already made against him. *See United States v. Harris,* 546 F.2d 234, No. 76–1380 (8th Cir. December 7, 1976); *United States v. Moss,* 544 F.2d 954 (8th Cir. 1976).

■ Appellant also contends that the trial court erred in replaying the tape of the conversation between Thompson and Schlingerman in Thompson's room at the Marriott. The jury, which had retired for deliberations, had asked that this tape be replayed. Appellant argues that replaying the tape "unnecessarily accentuated this piece of evidence to the prejudice of [appellant]." Whether a request by the jury to replay tapes is to be granted or denied is within the discretion of the trial court. *Stone v. United States,* 506 F.2d 561, 564 (8th Cir. 1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975). We find no abuse of discretion in the instant case.

Finally, appellant urges that "there was but one conspiracy with but one illicit objective," and hence that "but one sentence was appropriate, and Appellant seeks remand for sentencing on but one of the two counts."

■ The Circuits have divided on this issue of whether a conspiratorial agreement

---

12. "Termination occurs as to a particular conspirator when his involvement with the conspiracy ceases, either through resignation, indictment, apprehension, or confession." 4 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–154 (footnote omitted).

13. Telephone conversation, Thompson speaking to Schlingerman:

Well, gee, I'm at the Marriott Inn, cause I talked to him, you know, and he told me to meet him, and I was going to Miami—I'm staying over here, and I was going to leave tomorrow morning right away, ah, to get that $10,000 to him.

\* \* \* \* \* \*

Motel Room meeting, Thompson speaking to Schlingerman:

Why don't you sit right down here. Now this is what Walter gave me, so you know . . Unintelligible . . . in other words, . . Unintelligible . . . this is a pound . . Unintelligible. . . . We got it in the bag here. . . . unintelligible. . . . Now, you can take that with you.

Schlingerman: OK.

All other considerations aside, the garbled nature of this excerpt raises in our minds serious doubts as to its utility, although in this context we need not rule on the question. We note that the admission of a tape recording containing inaudible portions is a matter within the sound discretion of the trial court. *United States v. Howard,* 504 F.2d 1281, 1287 (8th Cir. 1974); *United States v. Skillman,* 442 F.2d 542, 552 n. 8 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

14. It is not beyond argument that under the doctrine of completeness, 7 *Wigmore on Evidence* § 2094 (3d ed. 1940), that minor hearsay portions were admissible, despite their hearsay character, since their omission might have resulted in a disjointed conversation confusing to the jury. *Cf. United States v. Lemonakis,* 158 U.S.App.D.C. 162, 485 F.2d 941, 949 (1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974) (tape recording admissible as a reciprocal and integrated utterance between the two parties).

to distribute and import can support two separate prosecutions, the result depending upon the premises from which analysis proceeds.[15] In view of the fact that concurrent sentences were given on Counts II, III, and IV in the case before us, we do not believe it in the best interests of judicial economy to further vex the issue. *United States v. Beitling,* 545 F.2d 1106, No. 76–1235 (8th Cir. November 9, 1976).[16]

Affirmed.

**15.** The Fifth and Ninth Circuits have sustained dual prosecutions, *United States v. Houltin,* 525 F.2d 943, 950–51 (5th Cir. 1976); *United States v. Marotta,* 518 F.2d 681, 684–85 (9th Cir. 1975), while the First and Sixth Circuits have held to the contrary, *United States v. Honneus,* 508 F.2d 566, 569 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *United States v. Adcock,* 487 F.2d 637, 639–40 (6th Cir. 1973).

**16.** "The concurrent sentence rule * * * is that where a defendant receives concurrent sentences on plural counts of an indictment, and where the conviction on one count is found to be good, a reviewing court need not pass upon the validity of the defendant's conviction on another count or on other counts if a ruling in his favor would not reduce the time he is required to serve under the sentence imposed with respect to the valid conviction." *Sanders v. United States,* 541 F.2d 190, 193 (8th Cir. 1976).

In *United States v. Darnell,* 545 F.2d 595, 598, No. 76–1239 (8th Cir. November 5, 1976), we described our practice with regard to the application of the concurrent sentence doctrine:

The key to application or nonapplication of the rule lies as thus stated, in the discretion of the court. *Sanders, supra.* In the exercise of such discretion we consider the possibility of substantial prejudice that might flow from the presence on defendant's record of a conviction appealed but not ruled upon, whether the matter comes to us on direct appeal or collateral attack, and whether the evidence on the unreviewed counts might have "spilled over" and influenced decision on the count ruled upon. The short of it is that, following the teaching of Benton [*Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)], where we apply the rule, we apply it with caution.