UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles FITZGERALD, Alfred Kovach, Cornel Leahu, Charles W. Schubert, and Ernest Hamilton, Defendants-Appellants.

Nos. 77–1524, 77–1525, 77–1554, 77–1555 and 77–1563.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1978.

Decided June 14, 1978.

As Amended on Denial of Rehearing and Rehearing En Banc July 31, 1978.

K. Edwin Applegate, Bloomington, Ind., George C. Pontikes, Chicago, Ill., Joseph S. VanBokkelen, Hammond, Ind., Preston T. Breunig, David W. Mernitz, Indianapolis, Ind., for defendants-appellants.

Charles C. Wehner and Gary S. Shapiro, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and WOOD, Circuit Judges, and SOLOMON,* District Judge.

SOLOMON, Judge.

Appellants Fitzgerald, Schubert, Hamilton, Kovach, and Leahu were charged in Count 1 with a conspiracy to use the mails in furtherance of a scheme to defraud the East Chicago, Indiana, Board of Sanitary Commissioners (Board) and the citizens of the East Chicago Sanitary District (District). Other objects of the conspiracy were to obtain money and property through false representations and to use the facilities of interstate and foreign commerce to promote and carry on bribery contrary to Indiana law. Fitzgerald, Schubert, Hamilton, and Leahu were charged in Counts 2 to 6 with separate uses of the mails to further the scheme to defraud. They were charged in Count 8 with conspiracy to defraud the United States by obstructing the Internal Revenue Service (IRS) in the computation, assessment, and collection of taxes. Kovach was also charged with perjury before the grand jury.

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

After an eight-week jury trial in which none of the appellants testified, the jury convicted all appellants of all charges brought against them. On appeal, they raise a number of issues. We affirm.

## I

This case involves the unlawful taking by public officials, contractors, and others of more than two million dollars ($2,000,000) from a public works project.

At the trial, the government proved that Hamilton and Schubert were the directors of RSH, Inc., an architectural, engineering, and consulting service. RSH was under contract to the Board to design an estimated fifteen million dollar sewer project (the project) to be financed by public bonds. Hamilton and Schubert recommended to the Board which bid to accept and supervised the construction. Leahu was the Superintendent of the Board. Leahu gave final approval of the bid award and all changes in the work on the project.

Kovach, a friend of Leahu's, was an East Chicago storeowner with many political connections. He was formerly an assistant to the mayor of East Chicago.

Hernly[1] was the president and director of Hernly Brothers, Inc., a construction company which was awarded the bid. Fitzgerald was the director of Fitzgerald and Stutz, Inc., a construction company which formed a joint venture with Hernly Brothers to complete the project.

Wetterlin owned a business which designed and sold engineer control systems. Hinesley was a manufacturers' representative for firms which constructed wastewater treatment equipment.[2]

### BID DISCUSSIONS

The bids on the project were due on September 22, 1969. Between June and September, 1969, Hamilton, Schubert, Hernly, Wetterlin, and Fitzgerald met at

least four times. They discussed Hernly Brothers' proposed bid and made a number of changes in it. They agreed that each would receive one-fifth of the project's profits, and, in return for their shares, Hamilton and Schubert would recommend that the Board accept Hernly Brothers' bid.

The group also discussed a method to secretly divide the profits and avoid income taxes (the Wetterlin plan). Wetterlin suggested that Hernly Brothers should enter into spurious consulting contracts with a foreign corporation, send money overseas as payments on the contracts, and deduct the payments as business expenses. They would then retrieve the money and divide it, free of income taxes. Hamilton and Schubert later traveled to Europe to investigate its feasibility.

### PALMER HOUSE MEETING

Hernly and Wetterlin met with appellants at the Palmer House in Chicago on either September 20 or 21, 1969. This was a day or two before submission of Hernly Brothers' bid. Leahu said that he had called the meeting to "see how $1 million that was needed for East Chicago officials would be handled. . . ."[3]

Hamilton suggested the Wetterlin plan as a method of hiding a million dollars. Kovach and Leahu discussed the Wetterlin plan privately and then announced that the Wetterlin plan would be used. Appellants agreed that one million dollars would be paid to Leahu for "the East Chicago officials". In return, Hernly Brothers would be awarded the bid on the project.

Hernly was concerned about taxes on the million dollar bribe. He wanted to have another million collected to cover taxes on the first million if the IRS discovered it. Appellants agreed that the Wetterlin plan could be used to hide the second million.

---

1. Hernly testified for the government and received immunity.

2. Wetterlin entered into a plea agreement, and Hinesley entered a plea of guilty.

3. What other "East Chicago officials" were involved is unclear. The record demonstrates that Leahu received the money, but not whether he gave any of it to other officials.

Appellants also agreed to use "change orders" to generate at least the amount necessary for the bribe and tax money. The change orders were to be made in the project specifications, signed by Hamilton or Schubert, which either deleted or added items to the project. Hamilton or Schubert were to inflate the value of the additions and deflate the value of the deletions. This would produce hidden profits.

Hamilton, Schubert, Wetterlin, and Fitzgerald agreed that Hinesley would receive a $200,000 commission, the amount he lost when the parts he was to supply were deleted. Hinesley was to be placed on the Fitzgerald and Stutz payroll and paid through false invoices. Hinesley did no work for this money.

### BID AWARD AND FRAUDULENT PERFORMANCE BOND

Hernly Brothers and the other bidders submitted their bids on September 22, 1969. On the following day, Hamilton and Schubert recommended to the Board that Hernly Brothers' bid be accepted. The Board tentatively awarded the contract to Hernly Brothers, on condition that Hernly obtain a suitable performance bond.

Hernly was unable to obtain a performance bond. He told this to Leahu and wanted to withdraw his bid, but he was persuaded by Leahu to let Leahu and Kovach obtain the bond. Leahu and Kovach obtained a blank Underwriters Insurance Company bond and, with Hamilton's help, they completed it, using forged signatures. The Board accepted the fraudulent bond, and the insurance agent who provided the bond received $143,573.14 for his efforts.

Hernly Brothers was given the final award in early January 1970, and shortly thereafter formed the joint venture with Fitzgerald and Stutz.

### FORMATION OF ITAG

In January 1970, Hamilton, Fitzgerald, Schubert, Wetterlin, and Hernly went to Switzerland to carry out the Wetterlin plan. They met officials of a Swiss accounting firm, Allgemeine Treuhand (Allgemeine),

and agreed that Allgemeine would acquire the stock of Ingenieur Tiefbau A.G. (ITAG), a dormant Swiss corporation. The stock was divided into five equal shares and transferred in trust to Allgemeine. Allgemeine was to enter into consulting, purchase, and rental agreements on behalf of ITAG for minimum payments to ITAG of three million dollars.

Hamilton, Schubert, Wetterlin, Hernly, and Fitzgerald signed a separate agreement which provided that each of them was entitled to an equal share of ITAG stock.

In February 1970, Hernly Brothers contracted with ITAG for ITAG to provide consulting services for $80,000 a month. Project funds were used to pay the fee to ITAG, but ITAG provided no services. In June 1970, Hernly and Schubert contracted with ITAG for the rental of sheet welding equipment at $35,000 a month for twenty months. Some equipment was shipped to East Chicago but never used. Project funds again supplied the rental fee.

From February 1970, until November 1971, Hernly Brothers paid about $2.3 million to ITAG out of project funds generated mainly through the fraudulent use of change orders. The cash was usually carried by hand to Zurich; checks were either hand-carried or mailed.

From February 1970, until June 1971, Hernly, Hamilton, Schubert, Fitzgerald, and Wetterlin retrieved from ITAG in Switzerland one million dollars which was paid to Leahu. In November 1971, Hinesley retrieved $35,000 from ITAG, out of which he paid $25,000 to Schubert. In October 1971, in Zurich, Hamilton received an ITAG accounting, and in January and February 1972, Hernly mailed letters to ITAG which stated that Hernly Brothers intended to pay ITAG $20,000 and $30,000 to complete the contracts. The Swiss connection was shut down in early 1972.

### COLUMBINE I AND DIVISION OF PROFITS

The net "profit" on the project exceeded six million dollars. Hamilton and Schubert

wanted to receive their shares tax-free or at a reduced tax rate and suggested investing the profits in oil properties. In April 1971, Fitzgerald and Stutz and Hernly Brothers formed a joint venture with BESSI, a Denver-based investment firm. The joint venture was called Columbine I, and it was formed to transfer profits from Hernly Brothers to Hamilton and Schubert. Hernly Brothers and Fitzgerald and Stutz (the limited partners) contributed $3.2 million of project profits to BESSI (general partner) for investment for exploring and developing oil producing properties. Forty percent of the profit from the investments was to be paid to Hamilton and Schubert for their one-fifth shares of the sewer project profits.

In January 1972, Hamilton and Schubert sold their interests in Columbine I to BESSI in exchange for promissory notes valued at $1,090,930 each. In December 1972, BESSI filed a petition in bankruptcy. Hamilton and Schubert compromised their claims against it for about $75,000.

Wetterlin did not receive any of his share of the sewer project profits.

### PROGRESS ON THE PROJECT AND ITS COMPLETION

Hamilton and Schubert authorized five change orders before June 30, 1971, when the project was substantially completed, and later they authorized a sixth change order. The second and fifth change orders, signed and approved by Hamilton, generated most of the two million dollar bribe and tax money.

After June 30, 1971, except for the sixth change order, Hernly Brothers and Fitzgerald and Stutz did only maintenance work on the project. The sixth change order, completed in August 1973, substituted other work for nineteen uncompleted items. The contractors received no additional money for this work.

### II

### CONTENTIONS

One or more of the appellants raise the following specifications of error: (1) there was a fatal variance between the indictment and the evidence in Count 1, where the proof showed a number of minor conspiracies rather than one overall conspiracy as alleged; (2) the statute of limitations ran on Counts 1 through 6; (3) Leahu was not a "bribeable official" under Indiana law; (4) co-conspirators' out-of-court statements were erroneously admitted into evidence; (5) the cross-examination of Hernly was erroneously limited; and (6) appellants were prejudiced because the court misinformed counsel of its action on requested jury instructions.

### III

### SINGLE CONSPIRACY

■ The plan of action and the agreements entered into by Wetterlin and Hernly and all of the appellants at the Palmer House meeting established a basis for the jury to find one overall conspiracy. At that meeting the parties agreed: (1) that Leahu would receive a million dollar bribe in breach of his fiduciary duties to the Board and District; (2) that Hamilton and Schubert would breach their duty to protect the Board's and District's interests in the performance of the project by, among other things, dividing the profits with the general contractor; and (3) that the Wetterlin plan would be used to hide money and avoid taxes.

■ This was a complex conspiracy which included minor or subsidiary agreements, each one of which involved some but not all of the conspirators. It is immaterial that each of the appellants did not participate in all the activities or even know all the details of the conspiracy. *Blumenthal v. United States*, 332 U.S. 539, 557–58, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Hickey*, 360 F.2d 127, 138 (7th Cir.), *cert. denied*, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966); *United States v. Bastone*, 526 F.2d 971, 981 (7th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). They are bound as long as the results fall within the common pur-

poses of the conspiracy and appellants knowingly contributed toward its furtherance. *United States v. Greer*, 467 F.2d 1064 (7th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). As in *Blumenthal*, each subsidiary agreement here was a step in the formation of a larger conspiracy with common goals.

## STATUTE OF LIMITATIONS

■ Kovach and Leahu contend that their prosecution is time-barred because they were indicted on September 30, 1976, which was more than five years after the bribery conspiracy had been completed. The other appellants contend that the overt acts within the limitations period relate only to ITAG transactions, BESSI transactions, and the final change order—none of which had "any relationship . . . to the core fraud against the Sanitary District."

These contentions are based on the assumption that there were a number of separate conspiracies or that the objects of the conspiracy were entirely separable and distinct. We have already rejected those contentions.

The applicable statute of limitations for the crimes charged in Counts 1 through 6 is five years. 18 U.S.C. § 3282. There were a number of overt acts which took place within the limitations period. The jury could have reasonably found that any of these acts were in furtherance of the conspiracy. These include:

1. *The continued use of ITAG.* On November 5, 1971, Hinesley, pursuant to an authorization for release of ITAG funds, traveled to Switzerland and received $35,-000, $25,000 of which he paid to Schubert. He kept the remaining $10,000 as part of his "commission". Several months later Hernly sent letters to ITAG which terminated the consulting contract.

The Wetterlin plan and the ITAG structure were necessary to hide the money. Without them it would have been difficult to hide or pay the bribe money and the tax money or to share the profits with Hamilton and Schubert. This complicated system of concealment was a part of appellants' agreements from the beginning.

The jury could reasonably conclude that these acts of concealment were "done in furtherance of the *main* criminal objectives of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957).

2. *Columbine I.* In 1971 the Columbine I joint venture was formed by Fitzgerald and Stutz and Hernly Brothers with BESSI. This was the vehicle by which Hamilton and Schubert were to receive their shares of the profits. During 1971 and 1972, Hamilton and Schubert received approximately $30,-000 from the Columbine I investments. In December 1972, they received about $75,000 in compromise of their bankruptcy claims.

## LEAHU WAS A "BRIBEABLE OFFICIAL"

■ The use of interstate and foreign commerce facilities to carry on bribery in violation of Indiana law was one of the objects of the conspiracy. Appellants contend that they could not have conspired to bribe Leahu because he was not a "bribeable official" under Indiana law. Ind.Code §§ 35–1–90–4, 35–1–101–9 (1971) (repealed 1977). Section 35–1–90–4 made it unlawful to bribe any "employee of [a] political subdivision of [Indiana]." Section 35–1–101–9 made it unlawful to bribe any person holding "any lucrative office, or appointment or agency under the Constitution or any law of the state of Indiana for the purpose of procuring [a] public contract. . . ."

Appellants contend that because an Indiana sanitary district is not a municipal corporation within the meaning of the two percent tax limitation provision of the Indiana State Constitution, Leahu as Superintendent was not an employee of a political subdivision. There is no merit in this contention.

In *Archer v. City of Indianapolis,* 233 Ind. 640, 122 N.E.2d 607, 610–611 (1954) the Court held that sanitary district bonds payable out of a special tax did not create indebtedness of the municipality served by

the sanitary district. Nevertheless, the Court observed that the sanitary district functioned as an agency of the city. The sanitary district is under the control of a Board whose members are appointed and subject to removal by the mayor. The Board acts in the name of the City when it brings or defends an action and when it issues bonds.

We hold that as an employee of the Board, Leahu was an employee of the City and therefore a bribeable official under Indiana law.

### ADMISSION OF CO–CONSPIRATORS' OUT–OF–COURT STATEMENTS

■ Appellants contend that out-of-court statements made by Fitzgerald to Price Waterhouse & Co. auditors were improperly admitted.

In 1972, after the formation of Columbine I, BESSI proposed an SEC registration. Price Waterhouse & Co. was requested to make an audit which included a five-year earnings history of Hernly Brothers and Fitzgerald and Stutz. Over appellants' objections, Price Waterhouse employees were permitted to testify about statements made to them by Fitzgerald during the audit.

Price Waterhouse employees testified that Fitzgerald told them that:

1. Legal fees paid under the table to assure there would be no trouble with the municipal bonds were a "cost of doing business";

2. A politician told him where to secure the performance bond;

3. The Columbine I profits distributed to Hamilton and Schubert was a "stupid mistake", having nothing to do with the project;

4. He (Fitzgerald) had no ownership interest in ITAG, and the ITAG contracts were negotiated by unrelated parties;

5. The large profit on the project was generated by service and a machine from ITAG, a good economic situation, and earlier completion than expected; and

6. The project had received engineering services from ITAG.

The court instructed the jury that it could consider this testimony against all defendants named in Count 8, but only against Fitzgerald in Count 1.

Appellants argue that these statements were inadmissible hearsay because they were not made during the course of or in furtherance of the conspiracy. They assert that Fitzgerald made the statements to cover up after the Count 1 and Count 8 conspiracies had achieved their main goals. *Grunewald, supra,* 353 U.S. at 405, 77 S.Ct. 963.

Fitzgerald's statements as they relate to Count 1 were admitted against him only, and the jury was so instructed. The limitation was more than appellants were entitled to because from this and other evidence, the jury was entitled to conclude that they were made in furtherance of the Count 1 conspiracy.

Count 8 charged that appellants (with the exception of Kovach) conspired to defraud the IRS by reporting ITAG payments and personal expenses as business expenses on the 1970, 1971, and 1972 partnership tax returns for the Hernly Brothers-Fitzgerald and Stutz joint venture. In our view, there is a sufficient basis to find Fitzgerald's statements were made in furtherance of this conspiracy.

Nevertheless, even if it was error to admit them, the error was harmless. The existence of the Count 8 conspiracy and each conspirator's involvement was established by overwhelming evidence. Fitzgerald's statements added nothing substantial, and their effect was minimal in the light of all of the other evidence. *United States v. Smith,* 550 F.2d 277, 282 (5th Cir. 1977); *United States v. Williams,* 548 F.2d 228, 232 (8th Cir. 1977).

### LIMITATION ON THE CROSS–EXAMINATION OF HERNLY

Appellants contend that their sixth amendment confrontation rights were violated because their cross-examination of Hernly was limited.

In September, 1972, Hernly retained an attorney to advise him on his criminal liability from transactions with his co-conspirators.

In July, 1975, the government granted Hernly immunity, and shortly thereafter he was interviewed by Justice Department lawyers.

On cross-examination, Schubert's counsel asked Hernly:

"Did Mr. Tabbert [the attorney] advise you as to what criminal penalties you were facing?"

"Did you know in 1972 and 1973 what criminal penalties you were facing?"

"Why did you make an agreement with the government?"

"Was the number of years that you could possibly get in prison ever discussed with you?"

The government objected to each question, and each objection was sustained. Appellants contend that this limitation on their cross-examination violated their confrontation rights because they were not allowed to fully demonstrate Hernly's bias.

■ A defendant may not be deprived of the right of "effective" cross-examination when he is attempting to show bias on the part of a government witness. *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). But a trial court has wide discretion to limit cross-examination, particularly when further cross-examination into the witness' subjective thoughts would not be meaningful because of previous testimony revealing the witness' bias. *Bastone, supra*, 526 F.2d at 981.

■ The question is whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias. *United States v. Campbell*, 426 F.2d 547, 550 (2d Cir. 1970).

Hernly testified for eleven days. He was exhaustively cross-examined on: his receipt of immunity; subsistence and expense payments from the government; his personal and corporate liability for civil tax assessments and fraud penalties; his tax liability, as well as that of his brothers; the at-

tempts he made to get immunity for his Swiss associates; and his remaining interests in ITAG and BESSI.

The jury had ample information on Hernly's receipt of immunity and the benefits he derived from immunity. The court did not abuse its discretion when it sustained objections to these four questions.

## MISINFORMING COUNSEL OF COURT'S ACTION ON REQUESTED JURY INSTRUCTIONS

■ Appellants contend they were deprived of the opportunity to make effective jury arguments on the statute of limitations issue because the court misinformed them on the instructions it proposed to give on that subject.

The court held three instruction conferences. During the conference held after counsel's arguments to the jury, the court modified its previous position. It informed counsel that it would give Hamilton's requested instruction on concealment and its own instruction on the statute of limitations.

This was a complex eight week trial. There were two conspiracy counts and six substantive counts. Many witnesses testified, and many exhibits were admitted. The court ordered the parties to submit their requested jury instructions no later than one week before the trial. Only the government complied.

After two weeks of trial, the court again requested instructions, and noted that the case was very complicated. Three defendants submitted their proposed instructions one week later. The instructions in issue here were submitted by Hamilton about nine weeks after they were ordered to be filed, five weeks after the court again requested them and one day before final arguments.

If requests for jury instructions are to be of real help to the trial court, they must be filed early enough to enable the court to fully consider them. Here the court had no such opportunity because the requests were not timely filed. It would not have been

error for the court to have rejected them. *United States v. Tourine*, 428 F.2d 865 (2d Cir. 1970), *cert. denied sub nom. Burtman v. United States*, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

Appellants contend that if the court had informed them earlier that it would give these instructions, they would have argued the case differently. Even if that were true, appellants' own failure to timely file their requests was largely responsible for the situation about which they now complain. But the record shows that counsel fully argued the issues relating to the statute of limitations and concealment, the matters covered by the instructions. There was no prejudice here. *United States v. Pommerening*, 500 F.2d 92 (10th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974).

### OTHER ISSUES

We have studied all of the other claims of error. None of them have merit, and most of them are frivolous. The appellants had fair trials and the jury's verdicts were based on evidence establishing their guilt beyond all reasonable doubt.

Affirmed.