POSNER, Circuit Judge.
The defendant, Adel Daoud, was indicted first in September 2012 for attempting to use a weapon of mass destruction and attempting to damage and destroy a building by means of an explosive, in violation of 18 U.S.C. §§ 2332a(a)(2)(D) and 844®, and next in August 2013 for having, in addition, later solicited a crime of violence, murder for hire, and witness tampering, in violation of 18 U.S.C. §§ 373(a), 1958(a), and 1512(a)(1)(A), respectively.
The first indictment arose out of an investigation that began in May 2012 when Daoud, an 18-year-old American citizen and resident of Hillside, Illinois, a suburb of Chicago, joined an email conversation with two undercover FBI employees posing as terrorists who had responded to messages that he had posted online. The ensuing investigation, based in part on a series of surveillance warrants, yielded evidence that Daoud planned “violent jihad” — terrorist attacks in the name of Islam — and had discussed his plans with “trusted brothers.” He expressed interest in committing such attacks in the United States, utilizing bombmaking instructions that he had read both in Inspire magazine, an organ of A1 Qaeda that is published in English, and through internet searches.
One of his FBI correspondents put him in touch with an undercover agent (a “cousin”) whom the correspondent represented to be a fellow terrorist. After meeting six times with the “cousin,” Daoud selected a bar in downtown Chicago to be the target of a bomb that the agent would supply him with. The agent told him the bomb would destroy the building containing the bar, and warned him that it would kill “hundreds” of people. Daoud replied: “that’s the point.”
On September -14, 2012, Daoud parked a Jeep containing the bomb in front of the bar. In a nearby alley, in the presence of the agent, he tried to detonate the bomb. Nothing happened, of course, because the bomb was a fake. Daoud was immediately arrested. It was while in jail a month later that, according to the second indictment, he tried to solicit someone to murder the undercover agent with whom he had dealt.
The government notified the defendant, pursuant to 50 U.S.C. §§ 1806(c) and 1825(d) — sections of the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801 et seq. — that it intended to present evidence at his trial derived from electronic surveillance that had been conducted under the authority of the Act. Daoud responded through counsel with a motion seeking access to the classified materials submitted in support of the government’s FISA warrant applications. Counsel hoped to show that the “evidence obtained or derived from such electronic surveillance” had been based on “information [that] was unlawfully acquired” or that “the surveillance was not made in conform *481 ity with an order of authorization or approval,” 50 U.S.C. § 1806(e), both being grounds for suppression.
The government filed two responses: a heavily redacted, unclassified response, accessible to Daoud and his lawyers, and a classified version, accessible only to the district court, accompanied by an unclassified statement by the Attorney General that disclosure of the classified material, or an adversarial hearing with respect to it, “would harm the national security of the United States”; the harm was detailed in a classified affidavit signed by the FBI’s Acting Assistant Director for Counterter-rorism.
The district judge studied the classified materials to determine whether they should be shown to the defendant’s lawyers, who have security clearances at the level at which these materials are classified. The judge noted that counsel was seeking “disclosure of classified documents that are ordinarily not subject to discovery,” that “no court has ever allowed disclosure of FISA materials to the defense,” and that a court may order such disclosure only where “necessary” for “an accurate determination of the legality of the surveillance,” 50 U.S.C. § 1806(f), or of the “physical search” if that was how the FISA materials were obtained. § 1825(g). Nevertheless, remarking that “the adversarial process is integral to safeguarding the rights of all citizens,” that the Sixth Amendment presupposes “the right of the accused to require the prosecution’s case to survive the crucible of meaningful adversarial testing,” and that “the supposed national security interest at stake is not implicated where defense counsel has the necessary security clearances,” the judge ruled that “the probable value of disclosure and the risk of nondisclosure outweigh the potential danger of disclosure to cleared counsel.” And so she ordered the materials sought by defense counsel turned over to them. The order, though interlocutory, was appealable immediately, and the government appealed. 50 U.S.C. § 1806(h); 18 U.S.CApp. Ill § 7.
She acknowledged that the Attorney General’s submission — stating that disclosure of the classified material, or an adversarial hearing with respect to it, “would harm national security” — had “trigger[ed] an in camera, ex parte procedure [in the district court] to determine whether the surveillance of the aggrieved person [Daoud] was lawfully authorized and conducted.” FISA is explicit about this. It provides that “if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, [the court shall] review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.” 50 U.S.C. § 1806(f) (emphasis added).
So first the district judge must, in a non-public (“in camera”), nonadversarial (“ex parte ”) proceeding, attempt to determine whether the surveillance was proper. If in attempting to determine this the judge discovers that disclosure to the defendant of portions of the FISA materials is “necessary,” the judge may order disclosure, provided there is adequate security. The defendant’s brief tries to delete the statutory requirement of sequential ex parte in camera district court analysis by *482 a cropped quotation from the statute: “the court must review the FISA application, order, and related materials ex parte and in camera, unless ‘disclosure [to the defendant] is necessary to make an accurate determination of the legality of the surveillance.’ ” The defendant’s misreading of the statute would permit the district judge to avoid conducting an ex parte review if the defendant’s lawyers believed disclosure necessary, since if the judge does not conduct the ex parte review she will have no basis for doubting the lawyers’ claim of necessity. The statute requires the judge to review the FISA materials ex parte in camera in every case, and on the basis of that review decide whether any of those materials must be disclosed to defense counsel. The judge did not do that. She did not find that disclosure was necessary, only that it “may be necessary.” Although she read the FISA materials and concluded that she was “capable of making such a determination [an ‘accurate’ determination, as is apparent from a previous sentence in her order] of the legality of the surveillance,” she refused to make the determination, which if she was right in thinking she could make an accurate determination would have obviated the necessity for— and therefore the lawfulness of — disclosure of the classified materials to defense counsel.
The judge appears to have believed that adversary procedure is always essential to resolve contested issues of fact. That is an incomplete description of the American judicial system in general and the federal judicial system in particular. There are ex parte or in camera hearings in the federal courts as well as hearings that are neither or both. And there are federal judicial proceedings that though entirely public are nonadversarial, either partly or entirely. For example, a federal district judge presiding over a class action is required to determine the fairness of a settlement agreed to by the parties even if no member of the class objects to it. Eubank v. Pella Corp., 753 F.3d 718, 720, 2014 WL 2444388, at *2 (7th Cir. June 2, 2014). And when in a criminal case the prosecutor and the defendant agree on the sentence to recommend, the judge must make an independent determination whether the sentence is appropriate. If, though it is within the range fixed by Congress, he thinks the agreed-upon sentence too harsh or too lenient, he is empowered (indeed required) to reject the agreed-upon sentence and impose a different one within the statutory range. United States v. Siegel, 753 F.3d 705, 710, 2014 WL 2210762, at *5 (7th Cir. May 29, 2014). Another familiar example of nonadver-sarial federal procedure involves the “An-ders brief’ — a brief in which a criminal defendant’s lawyer states that the appeal is frivolous and therefore moves to be allowed to withdraw from representing the defendant. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). If the appellate court agrees, his motion is granted and the appeal dismissed. Unless the defendant expresses disagreement with the position taken by his lawyer in- the Anders brief (the court always invites the defendant to respond to the brief but defendants often do not), there is no adversary process. Yet the court proceeds to make its own determination whether an appeal would be frivolous. If the court disagrees, it denies the lawyer’s motion to withdraw and so retains the appeal.
Not only is 'federal judicial procedure not always adversarial; it is not always fully public. Child witnesses, especially in sexual abuse cases, are often allowed to testify behind a screen. Criminal defendants typically are allowed to conceal from the jury most or even all of their criminal history. (Notice that in such a case, and *483 in many other cases, secrecy inures to the defendant’s benefit.) Objections to questions to witnesses when sustained keep from the jury evidence that jurors might be very interested in. Documents placed in evidence may be redacted to conceal embarrassing material. Trade secrets— and classified materials are a form of “trade secret” — are routinely concealed in judicial proceedings. And of course judicial deliberations, though critical to the outcome of a case, are secret.
The propriety of government confidentiality is not limited to judicial proceedings. Though the Freedom of Information Act provides broad access to information collected by or generated within government, it has many exceptions. 5 U.S.C. § 552(b). The government’s records of people’s finances, collected by the Internal Revenue Service and other agencies, are secret. So are medical records of persons enrolled in Medicaid, Medicare, and the Veterans Administration’s hospital system. Employment files for the millions of federal employees are secret, as are public school teachers’ evaluations of children, government social workers’ judgments about their clients, and deliberations of a wide range of government officials, not limited to judges — for example, the doctrine of executive privilege shields many of the internal communications of executive-branch officials. The methods used by police to audit and investigate, to decide where to set up roadblocks and hide plainclothes officers, are secret, as are their communications with and the names of their confidential informants unless the informants testify.
Everyone recognizes that privacy is a legally protectable interest, and it is not an interest of private individuals alone. The Foreign Intelligence Surveillance Act is an attempt to strike a balance between the interest in full openness of legal proceedings and the interest in national security, which requires a degree of secrecy concerning the government’s efforts to protect the nation. Terrorism is not a chimera. With luck Daoud might have achieved his goal of indiscriminately killing hundreds of Americans — whom he targeted because, as he explained in an email, civilians both “pay their taxes which fund the government’s war on Islam” and “vote for the leaders who kill us everyday.”
Conventional adversary procedure thus has to be compromised in recognition of valid social interests that compete with the social interest in openness. And “compromise” is the word in this case. Daoud was first indicted almost two years ago. Defense counsel have been conducting discovery and have submitted extensive factual allegations to the district court. Those allegations — made in an extensive proffer by the defendant — were before the district judge when she was considering whether to disclose any of the classified FISA materials to defense counsel, along with the factual allegations made by the government as the result of its investigation. It was her obligation to evaluate the parties’ allegations in light of the FISA materials to determine whether she could assess the legality of those materials herself, without disclosure of them to Daoud’s lawyers.
The defendant’s lawyers place great weight on the difficulty of conducting a Franks hearing to determine the legality of a warrant to conduct FISA surveillance. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), held that a defendant can challenge a search or arrest warrant on the ground that it was procured by a knowing or reckless falsehood by the officer who applied for the warrant. Id. at 155-56, 98 S.Ct. 2674. Defense counsel would like to mount such a challenge in this case. But that’s hard to do without access to the classified materials *484 on which the government relied in obtaining a warrant to obtain access to Daoud’s communications. The drafters of the Foreign Intelligence Surveillance Act devised a solution: the judge makes the additional determination, based on full access to all classified materials and the defense’s proffer of its version of events, of whether it’s possible to determine the validity of the Franks challenge without disclosure of any of the classified materials to the defense. The judge in this case failed to do that.
She seems to have thought that any concerns about disclosure were dissolved by defense counsel’s security clearances. She said that “the government had no meaningful response to the argument by defense counsel that the supposed national security interest at stake is not implicated where defense counsel has the necessary security clearances” — as if disclosing state secrets to cleared lawyers could not harm national security. Not true. Though it is certainly highly unlikely that Daoud’s lawyers would, Snowden-like, publicize classified information in violation of federal law, they might in their zeal to defend their client, to whom they owe a duty of candid communication, or misremembering what is classified and what not, inadvertently say things that would provide clues to classified material. Unless and until a district judge performs his or her statutory duty of attempting to determine the legality of the surveillance without revealing any of the fruits of the surveillance to defense counsel, there is no basis for concluding that disclosure is necessary in order to avert an erroneous conviction.
It’s also a mistake to think that simple possession of a security clearance automatically entitles its possessor to access to classified information that he is cleared to see. (The levels of classification differ; someone cleared for Secret information is not entitled to access to Top Secret information.) There are too many leaks of classified information — too much carelessness and irresponsibility in the handling of such information — to allow automatic access to holders of the applicable security clearances. More than a million and a half Americans have security clearances at the Top Secret level, which is the relevant level in this ease. Office of Management and Budget, “Suitability and Security Processes Review: Report to the President,” Feb. 2014, p. 3, www.whitehouse.gov/sites/ default/files/omb/reports/suitability-and-security-process-review-report.pdf (visited June 14, 2014). Like the Fifth Circuit in United States v. El-Mezain, 664 F.3d 467, 568 (5th Cir.2011), “we are unpersuaded by the defendants’ argument that the Government’s interest [in confidentiality] is diminished because defense counsel possess security clearance to review classified material.”
So in addition to having the requisite clearance the seeker must convince the holder of the information of the seeker’s need to know it. If the district judge’s threshold inquiry into whether Daoud’s lawyers needed any of the surveillance materials revealed that they didn’t, their security clearances would not entitle them to any of those materials. The statute says that disclosure of such materials to them must be “necessary”; even without that word (the vagueness of which in legal contexts is legendary, as lucidly explained in Cellular Telecommunications & Internet Ass’n v. FCC, 330 F.3d 502, 509-12 (D.C.Cir.2003)), the judge in this case would have had to determine the lawyers’ need for the materials — more precisely, her need for them to have access to the materials so that she could make an accurate determination of the legality of the challenged surveillance. Rather than asserting such a need, she affirmed her capability of making an accurate determination without disclosing any classified materials *485 to defense counsel. Because she was “capable” of making the determination, disclosure was not “necessary” under any definition of that word. We conclude regretfully that the judge thus disobeyed the statute.
Our own study of the classified materials has convinced us that there are indeed compelling reasons of national security for their being classified — that the government was being truthful in advising the district judge that their being made public “would harm the national security of the United States” — and that their disclosure to the defendant’s lawyers is (in the language of section 1806(f)) not “necessary” for “an accurate determination of the legality of the surveillance.” So clear is it that the materials were properly with-held from defense counsel that there is no need for a remand to enable the district judge to come to the same conclusion, because she would have to do so.
Not only do we agree with the district judge that it is possible to determine the legality of the government’s investigation of Daoud without disclosure of classified materials to his lawyers; our study of the materials convinces us that the investigation did not violate FISA. We shall issue a classified opinion explaining (as we are forbidden to do in a public document) these conclusions, and why therefore a remand to the district court is neither necessary nor appropriate.
One issue remains to be discussed. After the first oral argument, we held a brief in camera hearing at which questions were put by the panel to the Justice Department’s lead lawyer on the case concerning the classified materials. Only cleared court and government personnel were permitted at that hearing. The defendant’s lawyers, before leaving the courtroom as ordered, objected to our holding such a hearing and followed up their oral objection with a written motion. Their objecting to the classified hearing was ironic. The purpose of the hearing was to explore, by questioning the government’s lawyer on the basis of the classified materials, the need for defense access to those materials (which the judges and their cleared staffs had read). In effect this was cross-examination of the government, and could only help the defendant.
Defense counsel’s written motion cites no authority for forbidding classified hearings, including classified oral arguments in courts of appeals, when classified materials are to be discussed. We don’t think there’s any authority it could cite. The propriety of such hearings was confirmed in United States v. Sedaghaty, 728 F.3d 885, 891 and n. 2 (9th Cir.2013); cf. American Civil Liberties Union v. Department of Justice, 681 F.3d 61, 66, 70 (2d Cir.2012). But we are granting the request of the defendant’s lawyers for a redacted transcript of our classified hearing.
Finally, for future reference we suggest that when a district judge is minded to disclose classified FISA materials to defense counsel — a decision bound to precipitate an appeal by the government — the judge issue a classified statement of reasons, as it probably will be impossible to explain in an unclassified opinion all the considerations motivating her decision. In this case, however, our review of the materials persuades us both that there was no basis for disclosure and that a remand would be of no value.
The order appealed from is
REVERSED.