**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Maria Carmen Castillo DE GUDINO and
Nicolas Gudino-Ortega,
Defendants-Appellants.**

No. 82–2233.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1983.

Decided Dec. 19, 1983.

As Amended Dec. 28, 1984.

**1352**

Alphonse C. Gonzales, Chicago, Ill., for defendants-appellants.

Dean J. Polales, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This is an appeal from the defendants' convictions of conspiracy to transport illegal aliens into and within the United States.[1] For the reasons set forth below, we affirm the defendants' convictions.

In the spring and summer of 1981, the Immigration and Naturalization Service ("INS") investigated a smuggling operation that transported undocumented aliens from Tijuana, Mexico, to Los Angeles and then to Chicago. On July 6, 1981, INS Special Agent Hipolita Acosta, using the alias Carlos Ramirez, telephoned the headquarters of the operation in Los Angeles and arranged to have his fictitious relatives, Fernando and Arturo, smuggled to Chicago from Tijuana. Then, posing as Fernando Ramirez, Acosta traveled to Tijuana and was led on foot across the border into the United States by one of the guides (known as coyotes) who were employed by the operation. Acosta then was driven from the border to a "drophouse" in Oceanside, California. From there, he was driven through Camp Pendleton and was taken to the apartment of Rudolfo Cortez-Trejo ("Cortez"). Cortez then took Acosta to the home of Augustin and Carmen Castillo in Los Angeles, the headquarters of the operation, where he was housed with other smuggled aliens in the Castillos' converted garage. Three days later, the Castillos drove Acosta and the smuggled aliens to a train station, gave them tickets to Joliet, Illinois, and instructed them where to get off the train.

The INS investigation led to the return of a twenty-two-count indictment against fifteen persons.[2] Most of those charged

---

1. Defendant Maria Gudino also was convicted of transporting and concealing aliens, and she appeals these convictions as well.

2. The twenty-two-count indictment, returned on October 21, 1981, superseded a four-count indictment that had been returned on August 28, 1981. The superseding indictment added two defendants, Martin Cervantes-Pulido and Rudolfo Cortez-Trejo, and it contained eighteen additional counts charging members of the conspiracy with unlawfully transporting, harboring, and concealing eighteen additional aliens.

either pled guilty or became fugitives. Only Nicolas Gudino, Maria Gudino, and Martin Cervantes-Pulido stood trial.

During the trial, the government presented evidence that Maria Gudino, daughter of Augustin and Carmen Castillo, left her Chicago home in July 1981, went to her parents' house in Los Angeles, and took charge of the smuggling operation while her parents were in Mexico. Cortez, whose job in the operation was to deliver the illegal aliens to the Castillo house, testified that in July 1981 he received telephone calls from Maria Gudino and that Maria paid him his $1,800 fee for delivering nine aliens. Cortez also testified that he was a codefendant in this case. He stated that he pled guilty to the charges in the indictment and agreed to cooperate with the government in exchange for the government's agreement not to recommend a sentence and to inform the sentencing court of Cortez's cooperation. Cortez's written plea agreement was entered into evidence. On cross-examination, Cortez stated that, at the time he entered his guilty plea, he had been told that there was a possibility that he would be deported. Cortez admitted further that he had many ties to the United States and did not want to be deported. Counsel for Maria Gudino attempted to cross-examine Cortez about his arrest in 1980 for smuggling illegal aliens. The government objected to this line of questioning, and the trial court sustained the objection.

In its case against Nicolas Gudino, Maria's husband, the government produced evidence at trial that Nicolas received payment from some of the Chicago residents who attained the illegal entry of their relatives through the Castillo smuggling operation. Manuel Corchado, a confidential informant for the INS who assisted the Castillo smuggling operation in Chicago, testified that he paid smuggling money to Nicolas on at least four occasions. Corchado also testified that he once was arrested in 1972 for being in the United States illegal-

ly, but he was never deported. Corchado stated further that, since 1972, he had cooperated with both the Drug Enforcement Agency ("DEA") and the INS and he believed he received consideration for his cooperation because he was never bothered again about his status as an illegal alien. On cross-examination, counsel for Nicolas Gudino questioned Corchado about a document relating to deportation proceedings against Corchado, a form entitled "Application for Suspension of Deportation." When the defense counsel attempted to introduce the document into evidence, the government argued that the document was not impeaching, and the trial court refused its admission.

The jury returned guilty verdicts against both Maria and Nicolas Gudino, while Martin Cervantes-Pulido was acquitted. On appeal, the Gudinos contend that the district court committed three errors that require reversal of their convictions. First, the district court prohibited cross-examination questions regarding Cortez's 1980 arrest. The defendants argue that these questions were important in establishing the bias or motives of Cortez and that their exclusion violated the sixth amendment. Second, the district court refused to accept into evidence a document regarding deportation proceedings against Corchado. According to the defendants, this document was impeaching and should have been admitted. Third, the district court allowed into evidence documents known as "pollo lists," [3] which were seized from the Castillos' house in Los Angeles. The defendants contend that no testifying witness was in a position to testify to their authenticity. Also, the defendants maintain that the documents were hearsay and that the business records exception to the hearsay rule cannot apply. The defendants further argue that although one of the entries in the pollo lists may be considered an admission, there was insufficient evidence to establish that the rest of

---

**3.** According to the descriptions appearing in the government's brief, "pollo lists" are sheets of paper containing columns that list the names of illegal aliens and their sponsors, along with dates, telephone numbers, dollar amounts, and records of payment. The word "pollo" is the Spanish word for "chicken," and it commonly is used to refer to aliens smuggled into the United States.

the entries were made during and in furtherance of the conspiracy. Finally, the defendants take the position that the pollo lists were highly prejudicial and, for that reason, should not have been admitted.

The United States denies that the trial court committed reversible error. The government argues, first, that since the scope of cross-examination is subject to limitation in the trial court's sound discretion and since Maria Gudino was given a full and fair opportunity to cross-examine Cortez effectively and to expose his biases, the trial court's refusal to allow questions regarding Cortez's 1980 arrest did not violate the sixth amendment. Second, the government contends that the court properly refused to accept into evidence the document regarding Corchado's deportation proceedings because the document was not impeaching and the jury had ample information with which to appraise Corchado's biases. Finally, the government maintains that the admission of the pollo lists was proper. According to the government, sufficient evidence was presented to lay a foundation for the admission of the lists. Furthermore, the government argues that the lists were admissible either because they were co-conspirators' statements, or because they were the business records of the Castillo organization, or because they contained circumstantial guarantees of trustworthiness sufficient to justify their admission under Fed.R.Evid. 803(24).

### Cross-Examination of Cortez

 It is clear that the sixth amendment guarantees each defendant the right to effective cross-examination of the witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In order for a cross-examination to

be effective, defense counsel must be permitted to expose the facts from which the factfinder can draw inferences relating to the reliability of the witness. Counsel must be able to make a record from which to argue why the witness might be biased. *Id.* at 318, 94 S.Ct. at 1111. It is also clear that a trial court has discretion to control and limit cross-examination. *Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). This circuit reconciled these competing principles in *United States v. Fitzgerald,* 579 F.2d 1014, 1021 (7th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978), which held that, when reviewing the adequacy of a cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias.[4] In *Fitzgerald,* this court found that exhaustive cross-examination questions regarding the witness's receipt of immunity, his payments from the government, his liability for tax assessments and fraud penalties, and the attempts he made to get immunity for his associates served to give the jury ample information on the witness's biases. The trial court therefore did not abuse its discretion in sustaining the government's objections to four questions relating to the witness's knowledge of the possible penalties that he faced. *See also United States v. Xheka,* 704 F.2d 974 (7th Cir.) (where defense counsel elicited impeaching evidence from a government witness, including past crimes and lies, the trial court's prohibition on mentioning the past maximum penalty faced by the witness was not an abuse of discretion), *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78

---

**4.** In arriving at this phrasing of the question, the court in *Fitzgerald* relied upon *United States v. Campbell,* 426 F.2d 547, 550 (2d Cir. 1970), which adopted the following language from *Gordon v. United States,* 344 U.S. 414, 417, 73 S.Ct. 369, 372, 97 L.Ed. 447 (1953): "[T]he question for this Court is whether rejection of petitioners' two efforts to impeach the credibility of [a government witness] did not withhold from the jury information necessary to a discriminating appraisal of his trustworthiness to the prejudice of petitioners' substantial

rights." The *Gordon* approach is equivalent to the approach of *Fitzgerald* and is consistent with the requirement of effective cross-examination established in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In order for a cross-examination to be effective, the fact-finder must be presented with information sufficient to appraise the witness's bias. Thus, when limiting cross-examination, a trial court may not withhold information that is necessary to such an appraisal.

L.Ed.2d 682 (1983); *United States v. Hinton,* 683 F.2d 195 (7th Cir.) (where a government witness was cross-examined about law enforcement officers having sought him out for information and about owing unpaid taxes to the government, the cross-examination was sufficient to allow the jury to assess adequately the witness's biases and the district court's refusal to allow questions regarding a purported misappropriation of funds was not an abuse of discretion), *cert. granted,* —— U.S. ——, 103 S.Ct. 567, 74 L.Ed.2d 930 (1982).[5]

■ In the present case, the government revealed, on direct examination, that Cortez had been named as a defendant in the indictment and that he reached a plea agreement with the government. On cross-examination, Cortez admitted that, at the time of the plea agreement, he knew there was a possibility that he would be deported. This information served to raise the possibility of bias on the part of the witness. Cortez's 1980 arrest, on the other hand, never led to prosecution [6] and therefore had minimal value in demonstrating bias. We thus hold that, without knowledge of this arrest, the jury had sufficient information to make a discriminating appraisal of the witness's motives and biases, and the trial court's refusal to allow questions relating to this arrest was not an abuse of discretion.

### Exclusion of Deportation Document Regarding Corchado

■ The admissibility of impeaching evidence is within the trial court's discretion. *Ramirez v. United States,* 294 F.2d 277, 282 (9th Cir.1961). In the present case, the application for suspension of deportation, purportedly belonging to Corchado, was not signed by Corchado, nor did the document contradict Corchado's testimony that he had never been deported. We find that the trial court did not abuse its discretion in refusing to admit the document into evidence.

### Admission of Pollo Lists

Rule 901 of the Federal Rules of Evidence requires that items be authenticated or identified before they can be admitted into evidence. Fed.R.Evid. 901(a). Authentication can be achieved through appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances. Fed.R.Evid. 901(b)(4). In *United States v. Wilson,* 532 F.2d 641 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), the Eighth Circuit, relying on rule 901(b)(4), found that the contents of certain notebooks revealed that the writer of the notebooks was familiar with the procedures used by the defendants in their drug operations. The court ruled that this was a prima facie showing that the writer was a member of the drug conspiracy charged in the indictment. The court also held that circumstantial evidence, such as the fact that the notebooks were found in an apartment frequented by the defendants, provided a further prima facie showing of the authenticity of the notebooks.

■ The facts surrounding the pollo lists in the present case are similar to those surrounding the notebooks in *Wilson.* The contents of the pollo lists consist of names of smuggled aliens and their sponsors, dates, telephone numbers, dollar figures, and records of payment. Given the testimony outlining the smuggling techniques of the operation, the contents of the pollo lists provided prima facie evidence that they were written by someone involved in the smuggling conspiracy. Furthermore, the lists were seized from the Castillo house, the headquarters of the operation, and this also provides prima facie evidence of their authenticity. Since the defendants did not rebut this evidence by showing that the documents were forged or otherwise uncon-

---

5. The petition for certiorari filed in the *Hinton* case is limited to the question of the scope of "public official" within the meaning of 18 U.S.C. § 201. The cross-examination issue was not raised in the petition and thus is not before the Supreme Court. —— U.S. ——, 103 S.Ct. 567, 74 L.Ed.2d 930 (1982).

6. During oral argument, counsel for the defendant-appellants stated that prosecution for the 1980 arrest was "declined."

nected with the smuggling conspiracy, we hold that they were properly authenticated.

The contents of the pollo lists also establish the lists as co-conspirator statements admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence. This rule provides that a statement is not hearsay (and thus is admissible) if it is a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. In the present case, the contents of the lists clearly show that their author was familiar with the workings of the conspiracy. The fact that the lists contain dates and records of payment is evidence that they were written during the course of the conspiracy. The names, dollar figures, and telephone numbers are evidence that the lists were utilized to maintain information necessary to continue the smuggling activities of the conspiracy. Since this evidence was not countered by any evidence that the lists were made at any time other than during the conspiracy or that the lists were not made to further the conspiracy, we hold that the lists were admissible as co-conspirators' statements. Additionally, we find no merit in the defendants' contention that the lists were overly prejudicial.

In light of our holdings that the trial court did not abuse its discretion by limiting the cross-examination of Cortez and by excluding the deportation document regarding Corchado, and that the pollo lists were admissible as co-conspirators' statements, we affirm the defendants' convictions.