In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1175

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

C. GREGORY TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 13 CR 572 — **Elaine E. Bucklo**, *Judge.*

ARGUED OCTOBER 26, 2015 — DECIDED SEPTEMBER 9, 2016

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendant Gregory Turner was convicted of willfully conspiring, with Prince Asiel Ben Israel, to provide services for Zimbabwean Special Designated Nationals ("SDNs"), a group of government officials and related individuals deemed to be blocking the democratic processes or institutions of Zimbabwe.

On appeal, Turner raises several challenges against his pre-trial and trial proceedings. First, he argues that the district court erred in admitting into evidence a document detailing his agreement to provide services for the Zimbabwean SDNs, called the "Consulting Agreement." Second, he contends that the district court erred in its instructions to the jury. Third, Turner argues that the district court erred in its interactions with the jury after deliberations had begun. We affirm.

Before turning to the case, we note that Turner also claims that the evidence obtained pursuant to the Foreign Intelligence Surveillance Act ("FISA") should have been suppressed. (Appellant Br. 35–39.) We have reviewed the classified materials and find that the investigation did not violate FISA. We shall issue a separate, classified opinion explaining this conclusion. *See United States v. Daoud*, 755 F.3d 479, 485 (7th Cir. 2014), *supplemented*, 761 F.3d 678 (7th Cir. 2014).

## I. BACKGROUND

We begin with a brief synopsis of the relevant legal framework for Turner's case, including the statutes, executive orders, and regulations underlying the Zimbabwe sanctions. Then, we summarize the pertinent factual background and procedural history.

### A. Legal Framework of Zimbabwe Sanctions

In 1977, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. 95-223 (codified at 50 U.S.C. §§ 1701–07), which empowered the President to declare a "national emergency" during peace time "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United

States." 50 U.S.C. § 1701(a). To counter this threat, the IEEPA broadly authorized the President to:

> [I]investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* § 1702(1)(B). Additionally, violations of "any license, order, regulation, or prohibition" issued pursuant to the IEEPA are unlawful and carry civil and criminal penalties. *Id.* § 1705.

In March 2003, President George W. Bush invoked the IEEPA to issue Executive Order 13288, titled "Blocking Property of Persons Undermining Democratic Processes or Institutions in Zimbabwe." 68 Fed. Reg. 11457 (Mar. 6, 2003). This order declared a "national emergency" in response to "an unusual and extraordinary threat to the foreign policy of the United States" arising from the actions and policies of certain Zimbabwean government officials that were "undermin[ing] Zimbabwe's democratic processes or institutions, contributing to the deliberate breakdown in the rule of law in Zimbabwe, to politically motivated violence and intimidation in that country, and to political and economic instability in the Southern African region." *Id.*

To counter this threat, Executive Order 13288 prohibited "[a]ny transaction or dealing by a United States person or

within the United States in property or interests in property" belonging to any of the special designated nationals ("SDNs") listed in the Annex. *Id.* Prohibited transactions or dealings include "the making or receiving of any contribution of funds, goods, or services to or for the benefit of any person listed in the Annex." *Id.* The order also prohibited "any conspiracy formed to violate the prohibitions." *Id.*

Among the seventy-seven persons listed in the Annex were Robert Gabriel Mugabe, the President; Simon Khaya Moyo, the former Deputy-Secretary for Legal Affairs (and current Ambassador to South Africa); Emmerson Mnangagwa, the Parliamentary Speaker; and Samuel Mumbengegwi, the former Minister of Industry and International Trade (and current Foreign Minister). *Id.* In November 2005, President Bush issued Executive Order 13391, which reiterated the prohibitions described in Executive Order 13288 but also took "additional steps," such as expanding the list of SDNs to include Gideon Gono, Governor of the Federal Reserve Bank. *See* 70 Fed. Reg. 71201 (Nov 22, 2005). Both executive orders remain in effect.

To effectuate these executive orders, the Department of Treasury's Office of Foreign Asset Control ("OFAC") enacted several regulations, commonly referred to as the "sanctions" against the Zimbabwean SDNs. 31 C.F.R. § 541.101 *et seq.* Under 31 C.F.R. § 541.201(a)(1), property located within the United States belonging to Zimbabwean SDNs is deemed "blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Under 31 C.F.R. § 541.405, the prohibited dealings with SDNs include "legal, accounting, financial, brokering, freight forwarding, transportation, public

relations, or other services" and extend "to services per-formed in the United States or by U.S. persons, wherever lo-cated." Pursuant to 31 C.F.R. § 541.204(b), "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part is prohibited." However, U.S. persons may apply for a license from OFAC that, if granted, would permit them "to engage in any transactions prohibited," such as providing services to SDNs, without violating these sanctions. 31 C.F.R. § 501.801(b).

## B. *Factual Background and Procedural History*

From November 2008 until April 2010, Turner conspired with Ben Israel to provide services to, or on behalf of, Zimba-bwean SDNs, without a license from the United States Treas-ury Department. Specifically, Turner and Ben Israel agreed to provide public relations services—lobbying U.S. officials to remove the sanctions, arranging for Zimbabwean officials to meet with U.S. officials to discuss the removal of sanctions, and assisting Zimbabwean officials in obtaining travel visas to the United States, to meet with U.S. officials to discuss re-moving the sanctions. Turner and Ben Israel were promised payment of $3,405,000 for their work.

On August 27, 2013, a grand jury returned an indictment against Turner, charging the following: (1) Count One alleged conspiring to act in the United States as an agent of a foreign government without prior notification to the Attorney Gen-eral, in violation of 18 U.S.C. §§ 371 and 951(a); (2) Count Two alleged acting in the United States as an agent of a foreign government without prior notification to the Attorney Gen-eral, in violation of 18 U.S.C. § 951(a); and (3) Count Three al-leged willfully conspiring to provide services on behalf of, or for the benefit of, Zimbabwean SDNs, in violation of IEEPA,

50 U.S.C. § 1705(c), and 31 C.F.R. §§ 541.201, 541.204, and 541.405.[1]

A jury trial against Turner began on September 29, 2014. During trial, the government presented evidence of Turner's and Ben Israel's agreement with Zimbabwean SDNs to provide lobbying services in exchange for $3,405,000. One key piece of evidence was the Consulting Agreement, a document which contained details of the arrangement and a distinctive four-installment payment structure keyed to specific events: (1) $90,000 upon signing of the contract, (2) $1,105,000 upon completion of a meeting in Zimbabwe, (3) $1,105,000 upon completion of a meeting in South Africa, and (4) $1,105,000 upon completion of this project. The government then presented evidence tying the Consulting Agreement to corresponding actions by Turner, Ben Israel, and the Zimbabwean SDNs.

Additionally, the government presented evidence of Turner's and Ben Israel's efforts to facilitate meetings and correspondence between U.S. officials and Zimbabwean SDNs. The government also established that Turner never applied for or received a license from the U.S. Treasury Department to permit him to provide services to, or on behalf of, Zimbabwean SDNs.

On October 10, 2014, the jury acquitted Turner on Counts One and Two and convicted him on Count Three. The district court held Turner's sentencing hearing on January 20, 2015.

---

[1] The August 27, 2013, indictment includes four counts, but only Counts One, Two, and Four pertain to Turner. R. 38. Therefore, Count Four as listed in the indictment is what is referred to as "Count Three" in Turner's case, for the purposes of his indictment, trial, and appeal.

The district court determined that Turner's advisory guidelines range was 14 to 21 months, based on an offense level of 14 and a criminal history category of I. Subsequently, the district court sentenced Turner to a within-guidelines range sentence of 15 months' imprisonment and one year of supervised release. Judgment was entered against Turner on January 21, 2015. Turner appealed.

## II. ANALYSIS

On appeal, Turner raises several challenges to his pre-trial and trial proceedings. When necessary, we provide additional factual background in order to fully address each claim.

First, Turner argues that the district court erred in admitting the Consulting Agreement into evidence as an authenticated coconspirator statement. Second, Turner contends that the district court erred in its instructions to the jury for Count Three, specifically contesting the court's definition of "willfulness," its decision not to require unanimity with regard to specific SDNs, and its inclusion of SDN Mumbengegwi. Third, Turner argues that the district judge erred in his interactions with the jury after deliberations had begun, specifically disputing the district judge's replacement of juror Chism and his *ex parte* communications with the jury.

### A. Consulting Agreement

We begin by examining Turner's challenge to the district court's admission of the Consulting Agreement into evidence as a properly authenticated coconspirator statement, pursuant to Federal Rules of Evidence 901 and 801(d)(2)(E).

On August 29, 2014, the government and Turner moved *in limine* to admit and to bar, respectively, the Consulting Agreement—the document that the government argues outlined Turner and Ben Israel's agreement with officials to receive $3,405,000 for their services.

The district court, on September 22, 2014, provisionally granted the government's motion "on the assumption that it will introduce evidence at trial sufficient to support the factual assertions made in its motion." (R. 176 at 1–2.) The critical facts included the following: "that (1) Ben Israel and Turner acted in accordance with the Consulting Agreement's distinctive payment structure and (2) Ben Israel, or someone acting on his behalf, sent the Consulting agreement to [a National City Bank employee] to explain the purpose of the incoming wire from [Monica] Mutsvangwa." (*Id.* at 14.) The district court assessed that, assuming the government introduced evidence establishing these facts, the Consulting Agreement was admissible as an authenticated coconspirator statement. (*Id.* at 14–15)

Then, during trial, the government presented evidence for these factual assertions and moved to admit the Consulting Agreement into evidence as a coconspirator statement. (Trial Tr. 57, Oct. 1, 2014.) Turner responded: "No objection." (*Id.*)

On appeal, Turner argues that the district court erred in admitting the Consulting Agreement as a properly authenticated coconspirator statement, pursuant to Federal Rules of Evidence 901 and 801(d)(2)(E). Specifically, he contends that the Consulting Agreement was hearsay and that it was not properly authenticated because the government presented insufficient evidence that Ben Israel was the declarant and that

the Zimbabwe meeting took place in accordance with the agreement's payment structure. We disagree.

This court reviews a district court's interpretation of the Federal Rules of Evidence *de novo* but the district court's decision to admit evidence for abuse of discretion. *United States v. Mendiola*, 707 F.3d 735, 738 (7th Cir. 2013). In Turner's case, the district court did not have to interpret the Federal Rules of Evidence; it merely determined whether the Consulting Agreement met the requirements for Rules 901 and 801(d)(2)(E). Accordingly, we review the district court's admission of the Consulting Agreement for an abuse of discretion.

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating … an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The authentication requirement can be fulfilled in a variety of ways, including by evaluating "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4); *see also United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012). "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *Fluker*, 698 F.3d at 999.

This court has upheld the authentication of document evidence under Rule 901(b)(4) where the declarant's specific identity was unknown but the content, other distinctive characteristics, and circumstances support that the declarant was a coconspirator. *See, e.g., United States v. Mokol*, 957 F.2d 1410, 1420 (7th Cir. 1992) (holding that handwritten bribe sheets

found in the defendant's home containing dates, names, initials, and amounts corroborated by other evidence were properly authenticated under Rule 901(b)(4), despite an unknown author). In *United States v. De Gudino*, 722 F.2d 1351, 1355–56 (7th Cir. 1984), in affirming an alien-smuggling conviction, this court held that lists of smuggled aliens were properly authenticated under Rule 901(b)(4), even though the lists' author was unknown. The *De Gudino* court held that there was "prima facie evidence of … authenticity" based on the testimony outlining the conspiracy's smuggling techniques, the fact that the lists were seized from the "headquarters of the [illegal alien smuggling] operation," and the contents of the lists, which included "names of smuggled aliens and their sponsors, dates, telephone numbers, dollar figures, and records of payment." *Id.*

Similar to *De Gudino*, here, the district court did not abuse its discretion in finding that the Consulting Agreement was properly authenticated under Rule 901(b)(4), despite uncertainty regarding the identity of the declarant, based on its content detailing the distinctive payment structure and the circumstances surrounding its receipt.

First, the district court found, based on the government's anticipated evidence (which was presented at trial), that Ben Israel and Turner acted in accordance with the Consulting Agreement's distinctive structure. The court noted "the Consulting Agreement's distinctive payment structure," which called for four payments keyed to specific events: (1) $90,000 upon signing of this contract, (2) $1,105,000 upon completion of a meeting in Zimbabwe, (3) $1,105,000 upon completion of a meeting in South Africa, and (4) $1,105,000 upon completion of this project. (R. 176 at 3, 10.) The court observed, that this

payment structure had a "high degree of correspondence" with Ben Israel's and Turner's actions, including their attempts to receive the $90,000 initial payment, their activities to arrange a South Africa meeting and "phase three visit to Zimbabwe," and their ongoing efforts to be paid by Zimbabwean officials. (*Id.* at 10–11.)

Next, the district court determined, again based on the government's anticipated evidence (which was presented at trial), that Ben Israel or a coconspirator sent the Consulting Agreement to a bank employee to explain the incoming wire from Monica Mutsvangwa. (*Id.* at 12–15.) It found that in response to a request from Ben Israel's bank for documentation to explain the incoming wire from Mutsvangwa's account, the Consulting Agreement was sent the next business day in an email from the account "princeasiel@aol.com," which was used by Ben Israel. (*Id.* at 13–14.)

Taken together, the district court's assessments relating to the Consulting Agreement's distinctive characteristics and receipt in connection with a coconspirator are more than sufficient to constitute "prima facie evidence of … authenticity," despite uncertainty surrounding the specific declarant. *De Gudino*, 722 F.2d at 1355. This is all that is required under Rule 901(b)(4). *Fluker*, 698 F.3d at 999.

In addition, Turner asserts that the Consulting Agreement was inadmissible hearsay. Because the Consulting Agreement was a coconspirator statement, we hold that it was properly admitted as non-hearsay, pursuant to Rule 801(d)(2)(E).

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement … is not hearsay" if it "is offered against an oppos-

ing party and … was made by the party's coconspirator dur-
ing and in furtherance of the conspiracy." A statement is ad-
missible under Rule 801(d)(2)(E) "if the government proves
by a preponderance of the evidence that (1) a conspiracy ex-
isted; (2) the defendant and the declarant were members of
the conspiracy; and (3) the statement was made during the
course and in furtherance of the conspiracy." *United States v.
Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

In this case, the facts establishing the Consulting Agree-
ment's authenticity under Rule 901(b)(4) also satisfy Rule
801(d)(2)(E). *See De Gudino*, 722 F.2d at 1356 ("The contents of
the [authenticated documents] also establish the [authenti-
cated documents] as co-conspirator statements admissible
under rule 801(d)(2)(E) of the Federal Rules of Evidence."). As
discussed, the government provided evidence, based on the
Consulting Agreement's distinctive characteristics and the
circumstances surrounding its transmission, that the Consult-
ing Agreement's declarant was a coconspirator who shared
the document to help achieve payment for lobbying services,
a goal of the conspiracy. Moreover, Turner's argument about
the uncertain identity of the Consulting Agreement's declar-
ant also fails in the context of Rule 801(d)(2)(E). This court has
explicitly held that it is "wrong to suggest that it is necessary
to know the precise identity of a coconspirator before state-
ments can be admitted under Rule 801(d)(2)(E)." *United States
v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000). Hence, the district
court did not abuse its discretion in admitting the authenti-
cated Consulting Agreement as a coconspirator statement un-
der Rule 801(d)(2)(E).

*B. Instructions to the Jury*

Next, Turner contests the district court's jury instructions for Count Three on three grounds. First, he argues that the court erred in its definition of "willfully" or "willfulness." Second, Turner contends that the court erred by not requiring jury unanimity with regard to the specific Zimbabwean SDNs for whom services were provided. Third, he argues that the court constructively amended the indictment by including SDN Mumbengegwi.

"We review *de novo* whether jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (internal quotation marks omitted). If this court "determine[s] that the instructions accurately summarize the law, [we] review[] the district court's phrasing of the instruction for abuse of discretion. Reversal is warranted only where the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted).

*1. Willfulness Definition*

Turner starts by disputing the district court's definition of "willfulness" or "willfully."

The district court's jury instructions stated: "Count Three of the indictment charges [Turner] with willfully conspiring to provide services on behalf of and for the benefit of certain specially designated nationals, specifically Robert Mugabe, Gideon Gono, Simon Moyo, or Samuel Simbarashe Mumbengegwi, without first having obtained a license from the

United States Department of the Treasury." (Trial Tr. vol. VI, 130, Oct. 7, 2014.) The district court provided the following definition for the term "willfully:"

> As used in Count 3, the defendant acted willfully if he acted intentionally and purposefully with the intent to do something the law forbids, that is, with bad purpose to disobey or to disregard the law. The defendant need not be aware of the specific law or rule that … his conduct would violate. In other words, the defendant does not have to know that his conduct would violate a particular law, executive order or federal regulation, but he must act with the intent to do something the law forbids.

(Trial Tr. vol. VI, 131, Oct. 7, 2014.)

On appeal, Turner claims that the district court's definition misstates the law. He argues, instead, that the definition of "willfulness" requires "that the government must show that [Turner] acted with 'the specific intent to do something the law forbids … i.e. providing services to Specially Designated Nationals.'" (Appellant Br. 27.)

In the present case, the district court's definition of "willfulness" accurately summarized the law because it is consistent with the Supreme Court's decision in *Bryan v. United States*, 524 U.S. 184 (1998).

In *Bryan*, the Supreme Court addressed the meaning of the term "willfully" for a defendant convicted of "'willfully' dealing in firearms without a federal license." *Id.* at 186. The Court held that the traditional definition of "willfully" applied—that the government only needed to prove "knowledge that the conduct is unlawful." *Id.* at 192. The court expressly rejected the defendant's arguments for "a more particularized

showing"—that the defendant knew that a specific federal law prohibited his conduct. *Id*. In reaching its conclusion, the Court affirmed the district court's explanation of the term "willfully," which read:

> A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act with the intent to do something the law forbids.

*Id.* at 190 (internal quotation marks omitted).

Here, the district court did not commit any error. The district court accurately stated the law—its definition of "willfully" is consistent with *Bryan*'s holding that, for willfulness, "the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required." *Id.* at 196. Turner's argument for a specific intent requirement was the very argument rejected by the *Bryan* Court. *Id.* at 192–96. Additionally, the district court did not abuse its discretion with its phrasing—its definition of "willfully" closely tracks the explanation of "willfully" upheld by the *Bryan* Court.

Turner contends that this court has sometimes required a more particularized definition of "willfulness," relying primarily on *United States v. Dobek*, 789 F.3d 698 (7th Cir. 2015). In *Dobek*, an engineer who sold canopy seals to the Venezuelan Air Force was convicted of exporting munitions to Venezuela without a State Department license, in violation of 22 U.S.C. § 2778(b)(2), (c), and 22 C.F.R. §§ 121.1, 123.1, 127.1. *Id.* at 699. In holding that "willfully" required "knowledge by the

defendant … that he needed a license to export the munitions
that he exported," the *Dobek* court provided the following rea-
soning:

> Ordinarily a person is conclusively presumed to
> know the law … But this principle, sensible when a
> person is bound to know that what he is doing is
> wrong, breaks down when a person who does not
> know of the law prohibiting what he does has no
> reason to think that he's acting wrongfully. Espe-
> cially when the law is a regulation rather than a stat-
> ute. He may not be aware of a regulation imposing
> an embargo on the export of a product to a particular
> country when it is a product that is commonly ex-
> ported. The United States is the world's largest ex-
> porter of munitions.

*Id.* at 700. The *Dobek* court, however, affirmed the defendant's
conviction under harmless error review because "the evi-
dence that the violation was willful was overwhelming," even
under a heightened willfulness definition. *Id.* at 702.

In this case, even if we were to give Turner the benefit of a
heightened willfulness definition, similar to the standard in
*Dobek*, his claim would still fail under harmless error review,
similar to the outcome in *Dobek*. Turner arranged meetings
and correspondence between U.S. and Zimbabwean officials
in order to discuss the lifting of the "sanctions"—Executive
Orders 13288 and 13391 and 31 C.F.R. § 541.101 *et seq*. In other
words, he provided services to the SDNs to assist in lifting the
prohibitions against providing services to the SDNs. Turner
was clearly aware that his conduct was unlawful, even under
a heightened definition of willfulness, and therefore "the evi-
dence that [Turner's] violation was willful was overwhelm-
ing." *Dobek*, 789 F.3d at 702.

Accordingly, the district court's definition of "willfully" was proper and there was no abuse of discretion in its phrasing.

*2. Jury Unanimity Regarding Specific SDNs*

Turner also argues that "the jury should have had to unanimously decide which Specially Designated National Turner conspired to provide services on behalf of" (Appellant Br. 30.) Turner had presented this argument as part of his proposed jury instructions, which the court rejected.

Instead, the district court provided the following instructions for the first element of Count Three: "To find the defendant guilty of the crime charged in Count 3, you must find that the government has proven … that two or more U.S. persons agreed to provide services on behalf of or for the benefit of a specially designated national." (Trial Tr. vol. VI, 130, Oct. 7, 2014.)

The Supreme Court has held that while jury unanimity is required for each principal element of a crime, "'a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible *means* the defendant used to commit an element of the crime.'" *Daniel*, 749 F.3d at 613 (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999).

As a result, in Turner's case, we must determine if the particular SDN on whose behalf Turner conspired to provide services for constitutes an element or a means of the offense. We conclude that it is a means, rather than an element, of Turner's offense.

We start by examining the language of the statute and regulations underlying Turner's offense. Turner was convicted

of conspiring to provide services on behalf of, or for the benefit of, Zimbabwean SDNs, in violation of the IEEPA, 50 U.S.C. § 1705(c), and 31 C.F.R. §§ 541.201, 541.204, and 541.405.

The IEEPA makes it unlawful for "a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a). This offense does not mention SDNs, let alone require a unanimous jury finding as an element the specific SDNs for whom services were performed.

We next consider 31 C.F.R. §§ 541.201, 541.204, and 541.405, which implement Executive Orders 13288 and 13391, which, in turn, were issued pursuant to the IEEPA. Section 541.201(a)(1) prohibits transactions of all property belonging to "[t]he persons listed in the Annex to Executive Order 13288 of March 6, 2003, as amended by Executive Order 13391 of November 22, 2005." There, "persons" are the Zimbabwean SDNs. Section 541.204(b) prohibits "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part." Section 541.405(a)(1) prohibits "services performed" by U.S. persons "[o]n behalf of or for the benefit of a person whose property and interests in property are blocked pursuant to § 541.201(a)."

Again, there is nothing in the language of these regulations to indicate that the jury must unanimously find as an element the specific SDNs for whom services were performed. In fact, the language of the regulations is worded broadly, so as to encompass any combination or group of SDNs—"*[t]he persons* listed in the Annex" and "*a person* whose property and interests in property are blocked" §§ 541.201(a)(1), 541.405(a)(1) (emphasis added). Thus, the

relevant statutory and regulatory language indicates that the specific SDN is a means, rather than an element, of Turner's offense.

Turner's argument is similar to the one rejected by this court in *United States v. Griggs,* 569 F.3d 341 (7th Cir. 2009). In *Griggs¸* a defendant convicted of conspiring to further a Ponzi scheme challenged the jury instructions, arguing that the jury should have been required to agree unanimously on an overt act that at least one of the conspirators had committed. *Id.* at 342–43. Our decision in *Griggs* rejected the defendant's argument, holding that "[t]he law distinguishes between the elements of a crime, as to which a jury must be unanimous, and the means by which the crime is committed." *Id.* at 343 (citing *Richardson*, 526 U.S. at 817–18 and *Schad v. Arizona,* 501 U.S. 624, 631, 649 (1991)). Applying this rule, we determined that the jurors had agreed unanimously on the defendant's crime—"that he had taken a step toward accomplishing the goal of the conspiracy." *Id.* at 344. We further held, in contrast, that it was "inconsequential" that the jury might have disagreed on the means of the crime, namely the overt acts or specific steps taken in carrying out the offense. *Id*.[2]

Like *Griggs*, here, as the government points out, even if the jurors in Turner's case had disagreed on *which* particular SDN that Turner conspired to provide services for, such disagreement would not mean that the jurors also disagreed on

---

[2] We note that the *Griggs* court did assess that the jury "may not have been unanimous about the *elements* of [defendant's] crime" but then determined it was harmless error. 569 F.3d at 344–45. However, this assessment does not affect *Griggs*'s conclusion, pursuant to *Richardson*, that a crime and its elements required jury unanimity, but the means of committing the crime did not.

*whether* Turner conspired to provide services for an SDN. (Appellee Br. 32–33.) In other words, the identities of the particular SDNs are a means, not an element, of Turner's offense. Therefore, it did not require jury unanimity.

Turner relies heavily on *Richardson* to support his argument that the particular SDN for whom services were provided is an element of the offense. In *Richardson*, the Supreme Court interpreted the Continuing Criminal Enterprise ("CCE") statute, 21 U.S.C. § 848, holding that to convict a defendant, jurors must unanimously agree not only that the defendant committed some "continuing series of violations" but also on "each individual violation" that made up the continuing series. 526 U.S. at 820, 824 (internal quotation marks omitted). In reaching this conclusion, the Supreme Court examined the language and legal tradition of the CCE statute in order to determine congressional intent, as well as the potential unfairness that would befall defendants if the predicate offenses were not deemed to be elements. *Id.* at 818–24; *see also United States v. Pollock*, 757 F.3d 582, 587 (7th Cir. 2014) (summarizing *Richardson*'s holding and reasoning).

Turner's reliance on *Richardson*, however, is misplaced. In *United States v. Gibson*, in declining to apply *Richardson* to require that the specific form of pecuniary gain was an element of murder-for-hire under 18 U.S.C. § 1958(a), this court held that *Richardson*'s analysis was "specific to the CCE statute." 530 F.3d 606, 611–12 (7th Cir. 2008). In the present case, Turner was convicted of violating the IEEPA, not the CCE statute, and therefore *Richardson* does not apply. Turner also fails to present any cogent arguments for applying *Richardson* to the IEEPA based on statutory language, legal tradition, or unu-

sual risk to defendants—the types of arguments found persuasive in *Richardson*. *See Pollock*, 757 F.3d at 587 (declining to extend *Richardson* to a felon in possession offense after analysis under the "*Richardson* factors"). Because *Richardson*'s analysis was specific to the CCE statute, this court and our sister circuits have routinely declined to apply it to other offenses. *See, e.g., id.* (rejecting the argument that possession of a *specific* firearm was an element of a felon in possession charge under 18 U.S.C. § 922(g)); *United States v. Lee*, 317 F.3d 26, 37–40 (1st Cir. 2003) (rejecting the argument that the specific devices possessed was an element of possession of counterfeit or unauthorized access devices under 18 U.S.C. § 1029(a)(3)). As such, we decline to apply *Richardson* to Turner's case.

In the alternative, Turner contends that "[a]t a minimum, the particular SDN is an object of the conspiracy," which also requires jury unanimity. (Appellant Br. 33.) This contention is meritless and simply repackages his previous argument. For Count Three, Turner's jury instructions named four SDNs—Mugabe, Gono, Moyo, and Mumbengegwi—and required that the government prove as an element "that two or more US persons agreed to provide services on behalf of or for the benefit of *a* specially designated national." (Trial Tr. vol. VI, 130, Oct. 7, 2014 (emphasis added).) In other words, the object of the conspiracy was providing services for *any combination* of the named SDNs. As discussed, the identity of the particular SDN is a means, not an element of Turner's offense. Therefore, Turner's contention fails.

### 3. *Constructive Amendment*

Turner also contends that the district court's jury instructions constructively amended his indictment because Count Three of the indictment *did not* include SDN Mumbengegwi,

but the court's jury instructions for Count Three *did* include this individual.

Turner raises his claim under the Fifth Amendment, which provides that "[n]o person shall be held to answer for a … crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "A constructive amendment to an indictment occurs when either the government …, the court …, or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998) (internal quotation marks omitted). "However, not all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments." *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (internal quotation marks omitted). Rather, the offense "charged in the indictment must be materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* (alteration in original and internal quotation marks omitted).

In this case, Count Three of the indictment charged Turner and Ben Israel with "willfully conspir[ing] to provide services on behalf of and for the benefit of Specially Designated Nationals Robert Mugabe, Gideon Gono, and Simon Khaya Moyo," in violation of the IEEPA and implementing regulations. (R. 38 at 18.)

After closing arguments, however, the district court instructed the jury that, "Count Three … charges the defendant with willfully conspiring to provide services on behalf of and for the benefit of certain specially designated nationals, spe-

cifically, Robert Mugabe, Gideon Gono, Simon Moyo, or *Samuel Simbarashe Mumbengegwi*." (Trial Tr. 130, vol. VI, Oct. 7, 2014. (emphasis added))

Because Turner did not raise an objection below, this court reviews his constructive amendment claim for plain error. *Cusimano*, 148 F.3d at 828. In this circumstance, we will only reverse if the constructive amendment constituted "a mistake so serious that but for it the [defendant] probably would have been acquitted in order for us to reverse." *Id.* (alteration in original and internal quotation marks omitted).

In this case, Turner's argument fails because it is similar to the one rejected by this court in *Phillips*. In *Phillips*, the defendant was charged with conspiracy to defraud the government and presenting a false claim, and the indictment only mentioned two fraudulent tax returns. 745 F.3d at 832. During trial, however, the government introduced evidenced of two additional fraudulent tax returns, arguing that "the unusual similarities among the four returns were proof of the conspiracy." *Id.* On appeal, the defendant argued that a constructive amendment had occurred.

The *Phillips* court rejected defendant's constructive amendment claim because "the indictment can be read naturally to include all four tax returns." *Id.* The *Phillips* court further held that the fact that only two returns are mentioned in the indictment "does not preclude the government from relying upon extremely similar evidence that also falls within the charged dates and of which [the defendant] clearly had notice." *Id.* Consequently, the *Phillips* court held that no constructive amendment occurred. *Id.* at 833.

Similarly, there was no constructive amendment of Turner's indictment. As in *Phillips*, Count Three of Turner's indictment can be read naturally to include SDN Mumbengegwi. Count Three explicitly states, "Paragraphs 1(a), (b), (c), (d) of Count One are reallaged here," and Paragraph 1(b)(v) of Count One specifically identifies Mumbengegwi as an SDN. (R. 38 at 2, 18.) Furthermore, like in *Phillips*, the evidence of Turner's relationship with SDN Mumbengegwi was extremely similar to the evidence of Turner's relationship with the other listed SDNs. And Turner clearly had notice regarding SDN Mumbengegwi, who was specifically identified in Count One of the indictment. *Phillips* confirmed that the "admission of evidence intricately related to the charged crimes … does not constructively amend the indictment," and we hold that this principle firmly controls Turner's claim. 745 F.3d at 832 (quoting *United States v. Alhalabi*, 443 F.3d 605, 614 (7th Cir. 2006). Thus, Turner's indictment was not constructively amended.

*C.   Interactions with Jury after Deliberations Began*

Lastly, Turner challenges the district court's interactions with the jury after deliberations had begun.

On October 7, 2014, at 3:05 p.m., the district judge asked the jurors to begin deliberations. The district judge then told the two alternate jurors that they could go home but were not formally excused because it was possible their services might still be needed. (Trial Tr. vol. VI, 137, Oct. 7, 2014.)

Approximately 45 minutes into deliberations, juror Chism sent the district judge a note that stated: "I have a funeral to go to tomorrow so I would like to know what you would like me to do." (*Id.* at 142.) The district judge discussed the note

with the government and Turner, and they agreed that the judge could confer with Chism about the situation *ex parte* in the jury room.

As the judge was walking to the jury room, he received another note from the jury inquiring about the schedule and Chism's request. (*Id.* at 145.) The judge then had an *ex parte* conversation with Chism in front of the jury. Chism informed the judge that that the funeral was for his cousin, it would take place at 11 a.m. the following morning, and that he would not be available to deliberate at all the following day. The judge described Chism as "annoyed" and "angry." (*Id.* at 146, 151.)

The judge returned to the courtroom and conferred with the government and Turner. The judge decided not to excuse Chism for the following reasons: he had not mentioned the funeral until deliberations had begun, another juror had requested time off for an uncle's funeral, and neither funeral was for an immediate family member.

The district judge returned to the jury room and communicated *ex parte* his decision with the jury, stating, "[w]e've decided that you need to go ahead and deliberate." (Trial Tr. vol. VII, 5, Oct. 8, 2014.) According to the judge, Chism responded that "he would not return the following day regardless of the court's order." (R. 233 at 1.)

Again, the judge went back to the courtroom and discussed the situation with the government and Turner. Ultimately, the judge decided to excuse Chism. He reasoned that "deliberations had barely begun (if at all)" and if he allowed Chism to take off the following day, he would also have to allow the other juror to go to a funeral, potentially extending the deliberations for over a week. (*Id.* at 2.)

On October 8, 2014, the next alternate juror, Timothy Lambin, was called. After Lambin assured the district judge that he had not discussed the case with anyone, the district judge instructed the jury to begin deliberations from the beginning. On October 10, 2014, the jury reached its verdict.

On appeal, Turner argues that the district judge erred by: (1) replacing juror Chism with an alternate and (2) engaging in *ex parte* communications with the jury.

*1. Replacement of Juror Chism with an Alternate*

Turner first argues that the district judge improperly replaced Chism with an alternate.

This court has held that a district court has discretion to replace a deliberating juror, pursuant to Federal Rule of Criminal Procedure Rule 24(c)(3), which provides:

> *Retaining Alternate Jurors.* The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

*United States v. Warner*, 498 F.3d 666, 688–89 (7th Cir. 2007).

Accordingly, this court reviews a district court's replacement of a deliberating juror with an alternate for an abuse of discretion. *Id.* at 690. If the district court has a "*legitimate basis* for th[e] decision [to replace a juror], there is no abuse of discretion." *Id.* (alteration in original) (emphasis added and internal quotation marks omitted).

Here, the district judge had a legitimate basis for excusing Chism. According to the district judge, Chism was "annoyed" and "angry," and he had declared that he would not return the following day regardless of the district court's order. This court has stated, "there is hardly anything that would make a juror less able to serve than his failure to show up." *United States v. Almonacid*, 70 F. App'x 390, 392 (7th Cir. 2003); *see also United States v. Peters*, 617 F.2d 503, 505 (7th Cir. 1980) ("[I]t is difficult to imagine a more complete disqualification than a failure to appear."). Thus, the district court did not abuse its discretion in replacing Chism with an alternate.

Turner argues that the district court erred in not demonstrating "good cause" to dismiss Chism.[3] This argument is without merit because it is based on the incorrect Federal Rule of Criminal Procedure. Turner's "good cause" argument and supporting cases are all premised on Rule 23(b)(3), which provides: "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." *See United States v. Araujo*, 62 F.3d 930, 931 (7th Cir. 1995); *United States v. Patterson*, 26 F.3d 1127, 1128 (D.C. Cir. 1994); *United States v. McFarland*, 34 F.3d 1508, 1511 (9th Cir. 1995) (discussing Rules 23 and 24 but analyzing the dismissal of a juror for "just cause" under Rule 23); *United States v. Tabacca*, 924 F.2d 906, 913–15 (9th Cir. 1991). In contrast,

---

[3] Turner uses the term "just cause" in his argument. However, "[i]n current Rule 23(b), the term 'just cause' has been replaced with the more familiar term 'good cause,' that appears in other rules. No change in substance is intended." Fed. R. Crim. P. 23(b), 2002 advisory committee note.

here, the district judge replaced Chism pursuant to Rule 24(c)(3). Consequently, Turner's argument fails.

*2.* Ex Parte *Communications with the Jury*

Turner next contends that the district judge had improper *ex parte* communications with the jury. He raises his claim under the Sixth Amendment's Confrontation Clause, the Fourteenth Amendment's Due Process Clause, and Federal Rule of Criminal Procedure 43.

This court has explained that a "defendant has a constitutional right to be present at all critical stages of a prosecution, but this right does not extend to every interaction between the court and the jury." *Winters v. Miller*, 274 F.3d 1161, 1168 (7th Cir. 2001) (citing *United States v. Gagnon*, 470 U.S. 522, 526 (1985)). The "mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *United States v. Bishawi*, 272 F.3d 458, 461 (7th Cir. 2001) (quoting *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (Stevens, J., concurring in judgment)). Instead, "the constitutional right to presence … exists where there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence." *Id*. at 461–62. (citing *Gagnon*, 470 U.S. at 526). Additionally, "[t]he broader, procedural right to be present afforded by Federal Rule of Criminal Procedure 43 is likewise not without limits." *Id.* at 462.

In this case, Turner challenges the district judge's *ex parte* communications with the jury, including his "conversation with the jury regarding replacing juror Chism" and his comment that "we are not going to be able to do this again …, it's only that you had just begun that I am going to excuse" somebody. (Appellant Br. 42.)

This court determines whether *ex parte* contact violates a defendant's constitutional or procedural right to presence under a harmless error standard. *Bishawi*, 272 F.3d at 462. Under this standard, this court will only reverse if the error affects the defendant's "substantial rights," which are those that affect the outcome of the case. *Id.* In other words, this court will "look to see if the communications had a prejudicial effect on the defendant and rendered the trial fundamentally unfair." *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (internal quotations marks omitted). We have held that "a right to presence violation entitles the defendant to a new trial only if the *ex parte* communication at issue likely affected the jury's verdict." *Bishawi*, 272 F.3d at 462.

In the present case, Turner's claim does not survive harmless error review because he fails to establish that the *ex parte* communication likely affected the jury's verdict.

As an initial matter, Turner persuasively asserts that his procedural right to presence under Rule 43 was violated. Rule 43(a) "entitles a defendant to be present at all stages of his trial," and "[c]ommunication between the judge and the jury, or a single juror, is one of those stages." *United States v. Pressley*, 100 F.3d 57, 59 (7th Cir. 1996) (citing Fed R. Crim P. 43(a) and *Rogers v. United States*, 422 U.S. 35, 39 (1975)). Here, the

district court engaged in *ex parte* communications with members of the jury without Turner or his counsel being present, thereby violating Rule 43.

It is less clear, however, whether Turner has demonstrated that he is entitled to a presumption of prejudice. We have held that "[i]n a criminal case, any private communication … with a juror during a trial *about the matter pending before the jury* is, for obvious reasons, deemed presumptively prejudicial." *Bishawi*, 272 F.3d at 462. (alteration in original) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)). This presumption, however, is "without question rebuttable." *Id.* (citing *Rushen*, 464 U.S. at 118–19).

Here, the record shows that all of the district judge's *ex parte* communications with the jury pertained only to the replacement of Chism, not the substance of the case. It is unclear whether these communications relate to "the matter pending before the jury" and at least one of our sister circuits has expressly distinguished between *ex parte* contacts that are "merely ministerial in nature" and those that constitute "substantive communications." *United States v. Martin*, 777 F.3d 984, 991 (8th Cir. 2015) ("A defendant is not prejudiced by ex parte contacts between judge and jury that are merely ministerial in nature and not substantive communications.")

Regardless, even if Turner was entitled to a presumption of prejudice, his claim fails to survive harmless error review because these *ex parte* contacts did not likely affect the outcome of the case. The alleged *ex parte* conversations regarding the replacement of Chism concerned a proper exercise of discretion by the district court. And the district judge's *ex parte* comment had no determinable, much less a fundamentally unfair, effect on the deliberations—Chism was replaced by an

alternate and the jury subsequently returned a verdict. Thus, there is nothing to suggest that these *ex parte* communications impacted the outcome of the case.

Turner asserts that the other jurors might have disagreed with Chism and the *ex parte* communications might have allowed them to effectuate his removal. His contention, however, is pure speculation. Not only is this scenario unsupported, but it is unlikely given that the deliberations had "barely begun (if at all)" and the jurors "had nothing to do with making that decision [to replace Chism]." (Trial Tr. 7, Oct. 8, 2014.)

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.